Tom Cruise

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TOM CRUISE,
          Plaintiff,

    vs.                         Case No. CV 12-09124
                                 (DDP)(JCX)
BAUER PUBLISHING COMPANY, L.P.,
BAUER MAGAZINE L.P., BAUER MEDIA
GROUP, INC., BAUER, INC.,
HEINRICH BAUER NORTH AMERICA,
INC., and DOES 1-10,
inclusive,
          Defendants.

\*\*\* CONFIDENTIAL - ATTORNEYS' EYES ONLY \*\*\*

VIDEOTAPED DEPOSITION OF TOM CRUISE

September 9, 2013

9:04 a.m.

1900 Avenue of the Stars, 21st Floor

Los Angeles, California

REPORTED BY:

Jean F. Holliday

CSR No. 4535, RPR, CRR

Page 1

## Tom Cruise

| | |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | For the Plaintiff: |
| 4 | GREENBERG GLUSKER FIELDS CLAMAN MACHTINGER<br>BERTRAM FIELDS<br>1900 Avenue of the Stars, Suite 2100 |
| 5 | Los Angeles, California 90067<br>310.201.7454 |
| 6 | 310.553.0687 Fax<br>bfields@greenbergglusker.com |
| 7 | |
| 8 | -AND- |
| 9 | GREENBERG GLUSKER FIELDS CLAMAN MACHTINGER<br>AARON J. MOSS |
| 10 | 1900 Avenue of the Stars, Suite 2100<br>Los Angeles, California 90067 |
| 11 | 310.553.3610<br>310.201.2314 Fax |
| 12 | amoss@greenbergglusker.com |
| 13 | For the Defendants: |
| 14 | DAVIS WRIGHT TREMAINE LLP<br>ELIZABETH A. McNAMARA |
| 15 | 1633 Broadway, 27th Floor<br>New York, New York 10019-6708 |
| 16 | 212.489.8230<br>212.489.8340 Fax |
| 17 | lizmcnamara@dwt.com |
| 18 | -AND- |
| 19 | DAVIS WRIGHT TREMAINE LLP<br>DEBORAH ADLER |
| 20 | 1633 Broadway, 27th Floor<br>New York, New York 10019-6708 |
| 21 | 212.489.8230<br>212.489.8340 Fax |
| 22 | deborahadler@dwt.com |
| 23 | Also Present: |
| 24 | GREGORY A. WELCH, GENERAL COUNSEL, BAUER PUBLISHING GROUP |
| 25 | STAN BEVERLY, VIDEOGRAPHER |

Page 2

INDEX TO CONFIDENTIAL EXHIBITS
TOM CRUISE
Tom Cruise vs. Bauer Publishing Company
Monday, September 9, 2013
Jean F. Holliday, CSR No. 4535, RPR, CRR

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 100 | July 23, 2012 letter to Gregory Welch and Dan Wakeford, from Aaron J. Moss; document titled "Society of Professional Journalists Code of Ethics"; and a July 26, 2012 letter to Aaron Moss from Gregory A. Welch (Bates Nos. TC000353 - 356) | 62 |
| Exhibit 101 | E-mail string dated August 8, 2011 (Bates Nos. TC003350 and 3351) | 64 |
| Exhibit 102 | December 14th, 2012 letter to Ms. McNamara from Mr. Fields, two pages | 70 |
| Exhibit 103 | Printouts from The Wrap website, 14 pages | 74 |
| Exhibit 104 | E-mail string dated November 6, 2012 and August 2, 2013, four pages | 80 |
| Exhibit 105 | Copy of a New York Post article titled "Tom Rips 'Nazi' Diagnosis," dated June 12, 2008, one page | 85 |
| Exhibit 106 | Two-page printout from www.scientology.org titled "Scientology. What Does 'Suppressive Person' Mean"? | 100 |

Page 4

INDEX TO EXAMINATION
WITNESS: TOM CRUISE

| EXAMINATION | PAGE |
|---|---|
| By Ms. McNamara: | 7 |

INFORMATION REQUESTED

| Page | Line |
|---|---|
| 68 | 15 |

DOCUMENTS REQUESTED

| Page | Line |
|---|---|
| (NONE) | |

WITNESS REFUSED TO ANSWER

| Page | Line |
|---|---|
| 108 | 25 |

Page 3

INDEX TO EXHIBITS (Continued)

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 107 | Copy of a cover of Vanity Fair magazine from 2006 | 117 |
| Exhibit 108 | Chart showing schedules (Bates Nos. TC002814 - 2833) | 131 |
| Exhibit 109 | Document titled "Avjet Corporation Passenger Itinerary 1 January 2011 to 5 July 2012" (Bates Nos. TC002834 - 2836) | 143 |
| Exhibit 110 | Redacted phone bills (Bates Nos. TC002795 - 2800, 2791 - 2794, 2801, 2811 - 2813, 2790, 2808 - 2810, 2805 - 2807, 2802 - 2804) | 179 |
| Exhibit 111 | E-mail string dated July 17, 2012 (Bates No. TC003147) | 197 |
| Exhibit 112 | Series of e-mails (Bates Nos. TC000835, 836, 936, 937 and 918) | 200 |
| Exhibit 113 | E-mail string dated September 15, 2012 (Bates No. TC003140) | 203 |

Page 5

2 (Pages 2 to 5)

U.S. LEGAL SUPPORT
(800) 993-4464

EXHIBIT 10     65

## Tom Cruise

**Page 6**

```
 1      LOS ANGELES, CALIFORNIA;
 2      MONDAY, SEPTEMBER 9, 2013, 9:04 A.M.
 3
 4          TOM CRUISE,
 5      having been first duly sworn, was
 6      examined and testified as follows:
 7
 8          EXAMINATION
 9
10      THE VIDEOGRAPHER: Good morning. We're on the
11  record. This is the video recorded deposition of Tom
12  Cruise in the matter of Tom Cruise versus Bauer
13  Publishing Company, et al., taken on behalf of the
14  defendant. This deposition is taking place at 1900
15  Avenue of the Stars, Los Angeles, California, on
16  September 9th, 2013, at approximately 9:04 a.m.
17      My name is Stan Beverly. I'm the videographer
18  with U.S. Legal Support located at 11845 West Olympic
19  Boulevard, Los Angeles, California.
20      Video and audio recording will be taking place
21  unless all counsel have agreed to go off the record.
22      Would all present please identify themselves
23  beginning with the witness.
24      THE WITNESS: Tom Cruise.
25      MR. FIELDS: And I am Bert Fields, one of the
```

**Page 7**

```
 1  lawyers for Mr. Cruise.
 2      MR. MOSS: Aaron Moss, also for Mr. Cruise.
 3      MS. McNAMARA: Elizabeth McNamara for the
 4  defendants, along with my colleague Deborah Adler.
 5      MR. WELCH: And Greg Welch also for the
 6  defendants.
 7      THE VIDEOGRAPHER: The certified court reporter
 8  is Jean Holliday.
 9      Would you please swear in the witness.
10
11          TOM CRUISE,
12      having been first duly sworn, was
13      examined and testified as follows:
14
15          EXAMINATION
16
17  BY MS. McNAMARA:
18      Q. Good morning, Mr. Cruise.
19      A. Good morning.
20      Q. Thank you for coming. It's a standard
21  question, so --
22      A. Uh-huh, sure.
23      Q. -- don't take offense, but I need to ask you to
24  begin whether you're taking any medication or anything
25  that would impede your ability to speak --
```

**Page 8**

```
 1      A. No.
 2      Q. -- honestly?
 3      A. No.
 4      Q. And truthfully?
 5      A. None.
 6      Q. Have you had your deposition taken before?
 7      A. Yes, I have.
 8      Q. And on how many occasions?
 9      A. I don't know. One, two, three, the one for Bob
10  Towne in the writing thing. Maybe four, something like
11  that.
12      Q. Okay. In what actions were they?
13      A. One was a lawsuit with Sephora, I think. I
14  don't know. I don't.
15      MR. FIELDS: I don't get to answer.
16  BY MS. McNAMARA:
17      Q. Mr. Cruise, don't look --
18      A. Oh, sorry. Sorry.
19      Q. -- to your counsel to answer.
20      A. You know what, I -- I honestly --
21      Q. He's not here to testify.
22      A. Sorry about that. You know, Bert can tell you.
23  I don't really --
24      Q. You don't remember any -- any action that you
25  testified in?
```

**Page 9**

```
 1      A. No. There is a few that I testified in. There
 2  was one for SAG, for -- I guess for Bob Towne. There
 3  was a lawsuit that we had I think with Phillips years
 4  ago, and there was a recent case.
 5      Q. Involving Mr. Supir?
 6      A. Yes. Yes, I think so.
 7      Q. And that testimony occurred last year; is that
 8  correct?
 9      A. We just did it recently, yes.
10      Q. I want you to -- if for any reason you don't
11  understand one of my questions, I want you to tell me
12  that you don't understand it.
13      A. Certainly.
14      Q. If you don't do so, then we'll assume for the
15  record that you did understand the question.
16      A. Certainly.
17      Q. Okay? Did you do anything to prepare for this
18  deposition?
19      A. Met with Bert and Aaron yesterday.
20      Q. Okay. For how long?
21      A. Probably talked about it for about an hour.
22      Q. Okay. Did you look at any documents?
23      A. Just reviewed the covers again of the
24  magazines.
25      Q. Did you review the articles?
```

3 (Pages 6 to 9)

## Tom Cruise

| | Page 74 | | Page 76 |
|---|---|---|---|
| 1 | the same day as the filing of the joint Rule 26(f) | 1 | daughter with "Abandoned By Daddy," to me that's what |
| 2 | report in this litigation where your lawyer at the last | 2 | sticks out the most. |
| 3 | minute had injected the notion that one of the issues in | 3 | BY MS. McNAMARA: |
| 4 | the litigation would be Bauer's history of bigotry and | 4 | Q. Okay. And that wouldn't have happened -- |
| 5 | hatred toward minority groups. And we can have this | 5 | A. Had they not published it. |
| 6 | marked as Bauer's Exhibit 103. | 6 | Q. And if you had not sued. It wouldn't be part |
| 7 | (Exhibit 103 marked) | 7 | of this litigation if your lawyers had not -- |
| 8 | THE WITNESS: Thank you. | 8 | A. Had they not published it. |
| 9 | BY MS. McNAMARA: | 9 | Q. Let me finish, Mr. Cruise. I understand -- |
| 10 | Q. And before you read that, Mr. Cruise, have you | 10 | A. You cut me off -- |
| 11 | ever seen this news article before? | 11 | Q. I understand -- |
| 12 | A. No, I haven't. | 12 | A. When I was talking earlier you cut me off. |
| 13 | Q. Were you aware in any way that your lawyers had | 13 | Q. Then I apologize. I didn't mean to cut you |
| 14 | anything to do with this news article? | 14 | off. |
| 15 | A. No. | 15 | A. Okay. |
| 16 | Do you want me to read the whole thing? | 16 | Q. So let me -- |
| 17 | Q. You don't have to. I don't want to impede you | 17 | A. Let me finish, please. |
| 18 | if -- let me ask you one question. Refreshing -- does | 18 | Q. Sure. Sure. |
| 19 | looking at this article refresh your recollection as to | 19 | A. "He chose Scientology over Suri for good" -- |
| 20 | the name of the publication that was eluding you | 20 | "Has he chosen Scientology over Suri for good? |
| 21 | earlier, is it "Der Landser"? | 21 | Abandoned by Daddy." I mean come on, that is absolutely |
| 22 | A. I don't know. | 22 | disgusting. That is absolutely disgusting. And I have |
| 23 | Q. Now, are you aware as to whether your counsel | 23 | to tell you with everything -- listen, I am a public |
| 24 | had anything to do with the publication of this article? | 24 | person, I absolutely understand. For me there is -- I |
| 25 | A. No. | 25 | tolerate a tremendous amount and I'm very privileged to |

| | Page 75 | | Page 77 |
|---|---|---|---|
| 1 | Q. You believe that -- you're not aware or you | 1 | be able to have the life that I have, and I believe |
| 2 | believe they did not? | 2 | that. But there is a line that -- that I draw for |
| 3 | A. I'm not aware. | 3 | myself and -- and that's it. And I asked for an |
| 4 | Q. But you can't say that they did not; is that | 4 | apology. I asked for a retraction. They denied it, |
| 5 | right? | 5 | wouldn't do it, and then published that, you know -- |
| 6 | A. I don't know. | 6 | this is the second one, I guess, but they published it a |
| 7 | Q. Would you be troubled if you learned that your | 7 | second time. |
| 8 | counsel provided much of the information that's | 8 | It's very simple. This is something that could |
| 9 | contained in this article? | 9 | have gotten handled easily. And I understand, listen, |
| 10 | A. I would have to -- | 10 | with the Internet, with -- you know, I've been doing |
| 11 | Q. As a means to defend this litigation or to | 11 | this for 30 years. I've lived through the whole change |
| 12 | attack Bauer? | 12 | and incarnation, and there is a point where -- and this |
| 13 | A. I don't know. I'd have to think about it. | 13 | is it for me. So that's how I feel about it. |
| 14 | Q. Do you think that -- do you think that's a | 14 | Q. Okay. So just to close on The Wrap, this |
| 15 | legitimate means of prosecuting a legal claim, to supply | 15 | article, to your knowledge, you did not authorize your |
| 16 | news organizations with negative information concerning | 16 | lawyers to provide information to gin up this article, |
| 17 | the defendant, insinuations that they are anti-Semitic, | 17 | did you? |
| 18 | pro-Nazi and the like that has nothing to do with this | 18 | A. No, I didn't. |
| 19 | litigation? | 19 | Q. What about are you aware that there in the last |
| 20 | MR. FIELDS: Object to the form and calls for | 20 | year has launched an investigation of Bauer by the Simon |
| 21 | improper opinion. | 21 | Wiesenthal Center? |
| 22 | You may answer. | 22 | A. I know that they found out about it and they |
| 23 | THE WITNESS: I don't know, you know, honestly, | 23 | started investigating them, yes. |
| 24 | I really don't. What I find most disturbing is that I | 24 | Q. And you have a relationship with the center, |
| 25 | have to sit here and look at this photograph of my | 25 | don't you? |

20 (Pages 74 to 77)

Tom Cruise

**Page 78**

1  A. Yes, I do.
2  Q. And you've contributed a fair amount of money
3  to them, haven't you?
4  A. Yes, I have helped raise money for them.
5  Q. And you were awarded the Humanitarian Award in
6  May 2011 from the center?
7  A. Yes.
8  Q. Did you have anything to do with the center's
9  investigation of Bauer?
10 A. No, I didn't.
11 Q. Did you ask them to --
12 A. No --
13 Q. -- investigate?
14 A. -- I didn't.
15 Q. Do you know whether your lawyers had anything
16 to do with the investigation --
17 A. I don't know.
18 Q. -- by the center of Bauer?
19 A. No, I don't know.
20 Q. So it was just a coincidence?
21 A. I don't know.
22 Q. Do you know whether -- let me step back.
23    Have you personally tried to generate press
24 concerning Bauer being pro-Nazi?
25 A. No.

**Page 79**

1  Q. Have you spoken to any press organization
2  concerning your belief that the Bauer Pub- -- you know,
3  the Bauer Corporation --
4  A. No, I haven't.
5  Q. -- is pro-Nazi?
6  A. No, I haven't.
7  Q. That it's anti-Semitic?
8  A. I have not.
9  Q. Do you know -- have you authorized your -- your
10 counsel to generate such publicity?
11 A. No.
12 Q. Are you aware -- let me ask you this: Who is
13 Matt Galsor?
14 A. Matt Galsor, he's my lawyer.
15 Q. And he's a lawyer at this firm; is that right?
16 A. Yes.
17 Q. Are you aware that he e-mailed an AP reporter
18 suggesting that they publish a story about Bauer's
19 pro-Nazi sentiment?
20 A. No.
21 Q. Did you authorize such an effort?
22 A. No.
23 Q. Let me show you a document we'll mark as Bauer
24 Exhibit 104.
25    And for the record, I know you've designated

**Page 80**

1  this as attorneys' eyes only. This document that will
2  be marked as Exhibit 105 -- 104 -- I had it right the
3  first time, Exhibit 104, that this is a -- not a
4  confidential document.
5     (Exhibit 104 marked)
6  BY MS. McNAMARA:
7  Q. I don't know whether you can read German. I
8  can't read German, so you can skip to the English part
9  of this e-mail.
10 A. Okay.
11 Q. Is this the first time you've seen this e-mail,
12 Mr. Cruise?
13 A. Yes.
14 Q. Did you authorize Mr. Galsor to reach out to
15 the media and to supply them with a lot of largely false
16 information concerning Bauer?
17 A. No.
18 Q. And to seek publicity concerning them?
19    MR. FIELDS: Object to the form of the
20 question. I'm sorry.
21    You may answer.
22    THE WITNESS: No, I didn't. So Bauer isn't the
23 biggest pornographer in Germany?
24 BY MS. McNAMARA:
25 Q. No.

**Page 81**

1  A. There is a bigger one?
2  Q. Well, like for example, it says: It's likely
3  that concentration camp labor was used to publish these
4  weekly magazines, but we have not uncovered any evidence
5  to support that. If we publish that, you could sue us
6  for actual malice. It's an admission of falsehood. Do
7  you see that, Mr. Cruise?
8  A. I beg your pardon, this is what?
9  Q. If we -- if In Touch published, or if the
10 magazine published that Bauer used concentration camp
11 labor to publish its weekly magazines and at the same
12 time admitting that they have not uncovered any evidence
13 to support that contention, you understand that that
14 would state a claim for defamation, do you?
15    MR. FIELDS: Objection to the form of the
16 question. It asks for improper opinion.
17    You may answer.
18    THE WITNESS: I'm not a lawyer.
19 BY MS. McNAMARA:
20 Q. You can answer.
21 A. I'm not a lawyer.
22 Q. Okay.
23 A. I'm not a lawyer.
24 Q. You -- you would be --
25 A. But is it true that as recently as May this

21 (Pages 78 to 81)

U.S. LEGAL SUPPORT
(800) 993-4464

EXHIBIT 10

68

**Page 82**

1  year Bauer has distributed ultra-radical racist and
2  anti-Semitic magazines from neo-Nazi publisher?
3     Q. No. But I'm not here to testify.
4     A. That Bauer's -- that Bauer's -- that Bauer's
5  company didn't do that.
6     Q. I'm not here to testify, Mr. Cruise.
7     A. Well, I'm just --
8     Q. My question --
9     A. -- curious because you said that --
10    Q. My question to you is did you authorize this
11 press efforts by your counsel?
12    A. No. No, I didn't. No, I didn't.
13    Q. And you were not aware of it; is that right?
14    A. No, I wasn't.
15    Q. And if you compare, and I -- you can -- I'm not
16 asking you necessarily to do, but if you compare many of
17 the contentions in this e-mail with The Wrap article,
18 many of the exact same facts are included. Does that
19 help to inform whether your counsel were also
20 responsible for the content of The Wrap article?
21       MR. FIELDS: Objection to the form.
22       You may answer.
23       THE WITNESS: I mean I don't know if they were
24 or not. I didn't authorize it.
25 ///

**Page 83**

1  BY MS. McNAMARA:
2     Q. Do you believe such tactics like this after you
3  file a defamation lawsuit and then you seek to gin up
4  press around the world about the company that has
5  nothing to do with the content or the issues in the
6  litigation, do you believe that's ethical?
7        MR. FIELDS: Object to the form of the
8  question. Asks for improper opinion.
9        You may answer.
10 BY MS. McNAMARA:
11    Q. You may answer.
12    A. Listen, I think it's -- you have to look at
13 something is it true or is it not true, and I -- listen,
14 I didn't authorize it.
15    Q. Setting aside the truth of this content, do you
16 believe that that's a proper litigation tactic?
17       MR. FIELDS: Same objection.
18       But you may answer.
19       THE WITNESS: A proper litigation tactic. I
20 don't know if it is a proper litigation tactic or not.
21 The one thing that -- all I wanted basically was for
22 them not to print that I abandoned my daughter and that
23 I chose my religion over my daughter, that's what I
24 want.
25 ///

**Page 84**

1  BY MS. McNAMARA:
2     Q. Okay.
3     A. That's what I wanted. I wanted an apology.
4  They didn't do it, and then they did it again. Is that
5  ethical? Is that ethical?
6        MR. FIELDS: You don't get to ask questions.
7        THE WITNESS: Okay. Sorry.
8        MS. McNAMARA: Thank you, Mr. Fields.
9     Q. Now seeing this e-mail from your lawyer,
10 Mr. Galsor, series of e-mails actually, do you now
11 believe that maybe he had something to do with the Simon
12 Wiesenthal Center investigation?
13    A. I don't know.
14    Q. Or The Wrap article?
15    A. I don't know.
16       MS. McNAMARA: We call for the production of
17 all documents evidencing contact with the press
18 regarding Bauer and Naziism and anti-Semitism.
19    Q. That's not for you, Mr. Cruise.
20    A. I was like okay, what does that mean?
21    Q. That's -- that's for your counsel that we're
22 calling for the production of all those documents.
23       And reacting to negative press by insinuating
24 an association with Naziism, this isn't the first time
25 that you've done this; is that right?

**Page 85**

1     A. What do you mean?
2     Q. That either you or representatives on your
3  behalf when you've -- when someone has been neg- --
4  attacked you negatively in the press in some manner, the
5  reaction is to accuse them of being pro-Nazi or
6  anti-Semitic or anti-religion?
7     A. I don't know.
8     Q. Have you ever --
9     A. Depends on the --
10    Q. -- heard that before?
11    A. Depends on the situation.
12    Q. Do you recall a statement by Dr. Drew Pinsky
13 concerning you?
14    A. No.
15    Q. Let me show you -- we'll mark this as
16 defendants' Exhibit 105 -- or it's not defendants'.
17 It's Exhibit 105.
18       (Exhibit 105 marked)
19       MS. McNAMARA: Off the record. I can't get
20 used to that. We always separated exhibits.
21       THE VIDEOGRAPHER: The time is approximately
22 10:51 a.m.
23       MS. McNAMARA: No, we're not off the record.
24       THE VIDEOGRAPHER: Oh, I'm sorry.
25       MS. McNAMARA: That comment was off the record.

Tom Cruise

Page 94

1 When I say "asserting a claim" I mean sending a
2 claim letter saying: You should retract this, you need
3 to -- you know, we're threatening to sue.
4 A. Uh-huh.
5 Q. It's short of lawsuit. Okay?
6 A. Yes.
7 Q. So with that understanding as -- as to
8 asserting a claim --
9 A. Yes.
10 Q. -- do you recall that your lawyers have
11 asserted claims concerning coverage about Suri prior
12 to --
13 A. Yes.
14 Q. -- the --
15 A. Yes.
16 Q. -- articles --
17 A. Yes. Thank you.
18 Q. -- at issue in this litigation?
19 A. Yes, I do. Yes.
20 Q. And one of them was about secret auditing of
21 Suri. Do you recall that?
22 A. I don't recall all of them, no.
23 Q. Or that you were creating a wedge between Katie
24 and Suri?
25 A. I don't recall all those.

Page 95

1 Q. Or that Suri was kept in a windowless room at
2 one of your homes?
3 A. I remember stuff when Suri was born, I do. I
4 don't know if it was specifically that, but I do recall
5 some of those kinds of statements.
6 Q. Before a claim letter is sent do you approve
7 the claim letter?
8 A. No, not all of them.
9 Q. Do you read the applicable articles that are
10 being challenged?
11 A. I get briefed on them or I read them, yes.
12 Q. And again, I think you testified to this, and I
13 apologize if I'm asking you to repeat it, but when you
14 say you get briefed on it, that's by Amanda Lundberg?
15 A. By Amanda or if it's a legal thing I'll call
16 Bert, discuss it with my counsel.
17 Q. Okay. Now, there came a time, Mr. Cruise, that
18 you and your wife separated; is that right, Katie
19 Holmes?
20 A. Where she filed divorce.
21 Q. Yes. And that was at the end of June 2012?
22 A. Yes.
23 Q. And since the divorce -- or rather since prior
24 to that time, from June 18th of 2012 until Thanksgiving
25 of 2012, you only saw Suri a few times; isn't that

Page 96

1 right?
2 A. Yes.
3 Q. I think your counsel have produced documents in
4 this litigation that includes your schedule and
5 travel --
6 A. Yes.
7 Q. -- and the like. And according to those
8 records you, during that period of time of June 18th
9 until Thanksgiving of 2012, you saw your daughter for 10
10 days.
11 A. I don't know the total number of days.
12 Q. Does that sound right?
13 A. I don't know. I'd have to look at it.
14 Q. They were the three days of July 17th to the
15 19th, when you came into New York, and then you went out
16 to the Hamptons. Do you recall that?
17 A. Yes, I do.
18 Q. Okay. You saw her for 12 hours on July 26, or
19 approximately thereof. Do you recall that? You were
20 flying from London to L.A. and you stopped in New York
21 for --
22 A. Yes.
23 Q. -- about 12 hours?
24 A. Yes.
25 Q. And then there were the six days,

Page 97

1 approximately, when you came to New York and picked up
2 Suri and you took her to Disney World?
3 A. Uh-huh.
4 Q. Do you recall that?
5 A. Yes, I do.
6 Q. So if you add those up, those are generously 10
7 days.
8 A. Okay.
9 Q. Do you have any reason to dispute that
10 calculation?
11 A. None.
12 Q. Prior to your divorce with Ms. Holmes was
13 Ms. Holmes close with your other children, Connor and
14 Isabella?
15 A. Yes.
16 Q. And was she close with your sisters?
17 A. Fairly, yes.
18 Q. One or more of your sisters lived in the home;
19 is that right?
20 A. At one point Cass did when we were living on
21 Alpine.
22 Q. Okay. But the other sisters don't -- you have
23 three -- is it correct you have three sisters?
24 A. Three sisters.
25 Q. Do they all live in Los Angeles?

25 (Pages 94 to 97)

U.S. LEGAL SUPPORT
(800) 993-4464

EXHIBIT 10

70

Tom Cruise

| | |
|---|---|
| 1  A. No, they don't. One lives in Florida. Two<br>2  live in Los Angeles.<br>3  Q. Okay. And was Katie close to your mother as<br>4  well?<br>5  A. Yeah, close enough, yes.<br>6  Q. I assume you had friends in the Church?<br>7  A. Uh-huh, many friends.<br>8  Q. And during the marriage was Katie a<br>9  practitioner of Scientology?<br>10  A. Yes, and before the marriage.<br>11  Q. And did she leave the Church when she divorced<br>12  you?<br>13  A. Yes.<br>14  Q. Had she left the Church prior to that time?<br>15  A. Not to my knowledge.<br>16  Q. Would you consider -- would the Church consider<br>17  Ms. Holmes to be a suppressive person upon leaving the<br>18  Church?<br>19  A. There is -- that is a distortion and a<br>20  simplification of -- of the matter.<br>21  Q. Okay. Explain to me what does a suppressive<br>22  person mean within the Church.<br>23  A. Someone who is -- basically has an antisocial<br>24  personality, someone who is dishonest, evaluates and<br>25  invalidates to the extreme. It goes on from there.<br>Page 98 | 1  MS. McNAMARA: Let's mark as Exhibit Number<br>2  106 -- thank you -- an excerpt from www.scientology.org,<br>3  which is the Scientology website.<br>4  (Exhibit 106 marked)<br>5  BY MS. McNAMARA:<br>6  Q. Are you familiar with that, Mr. Cruise?<br>7  A. I know there is a Scientology website. I don't<br>8  know the address.<br>9  Q. Okay. Two-page document with the title<br>10  "Scientology. What Does 'Suppressive Person' Mean"?<br>11  Prior to the break, Mr. Cruise, I was asking<br>12  you about what a suppressive person means within the<br>13  Church, and I appreciate that you didn't want to engage<br>14  in generalities --<br>15  A. Uh-huh.<br>16  Q. -- and that it can mean many things. So you're<br>17  welcome to look at this, but I wanted to direct your<br>18  attention to the bottom of the page.<br>19  A. Which part of the bottom of the page, please?<br>20  Q. Where it says about declaring someone a<br>21  suppressive person it says, "This can be done through<br>22  criminal acts already recognized by society as unlawful<br>23  or through the commitment of acts deemed Suppressive in<br>24  the Scientology Justice Codes, which includes the<br>25  Suppressive Act of publicly renouncing the faith."<br>Page 100 |
| 1  There is many different aspects to it. I don't want to<br>2  just give an oversimplification of religious doctrine.<br>3  Q. And I don't want you to either. But one aspect<br>4  of someone being a suppressive person -- or I think you<br>5  sometimes refer to it as SP; is that right?<br>6  A. Uh-huh, yes.<br>7  Q. One aspect of someone being SP is when they<br>8  leave the Church, isn't it?<br>9  A. Yeah, but it's also an oversimplification of<br>10  something, and just to state it in a simple term,<br>11  there's -- it's just a broader subject.<br>12  Q. Okay. I'm being told by the videographer that<br>13  we're about done with the tape so --<br>14  A. Sure.<br>15  Q. -- we need to go off the record and we can take<br>16  a break if you want.<br>17  THE VIDEOGRAPHER: This marks the end of Media<br>18  Number 1 in the video deposition of Tom Cruise. The<br>19  time is approximately 11:09 a.m. and we're going off the<br>20  record.<br>21  (Recess)<br>22  THE VIDEOGRAPHER: This marks the beginning of<br>23  Media Number 2 in the video deposition of Tom Cruise.<br>24  The time is approximately 11:18 a.m. and we're back on<br>25  the record.<br>Page 99 | 1  A. Uh-huh.<br>2  Q. Do you see that?<br>3  A. Yes.<br>4  Q. Did you understand that publicly renouncing<br>5  one's faith is deemed to be a suppressive act within the<br>6  Church, at least --<br>7  A. Yes.<br>8  Q. -- according to this website?<br>9  A. Yes.<br>10  Q. And it goes on to say on the next page that<br>11  "When someone has been expelled from the religion, that<br>12  person loses both his or her fellowship with the Church<br>13  as well as with other Scientologists."<br>14  A. Uh-huh.<br>15  Q. Do you see that?<br>16  A. Sure.<br>17  Q. Do you understand that to be true --<br>18  A. Yes.<br>19  Q. -- within the Church of Scientology?<br>20  A. Uh-huh.<br>21  Q. Since Ms. Holmes has left the Church of<br>22  Scientology have -- and I guess I'm going to focus<br>23  between the period of June and November of 2012, have<br>24  your two other children had contact with Ms. Holmes?<br>25  A. No.<br>Page 101 |

26 (Pages 98 to 101)

U.S. LEGAL SUPPORT
(800) 993-4464

EXHIBIT 10

71

## Tom Cruise

**Page 110**

1 that other publications were reporting that Katie left
2 you in part to protect Suri from Scientology, are you
3 not?
4     A. I heard of that. I don't know where it was all
5 coming from, but I heard that horrific thing.
6     Q. And do you know whether you or your counsel
7 sought any retractions from such published statements?
8     A. It is a blur. I'm sure they did at some point.
9 I don't know specifically which ones.
10     Q. Did you assert any legal claims against
11 publications arising out of the publication of the
12 contention that Ms. Holmes left you in part to protect
13 Suri from Scientology?
14     A. No, only the one that said that I abandoned my
15 daughter.
16     Q. So you didn't sue over those contentions?
17     A. Only the one -- only this one.
18     Q. And do you believe it to be false that
19 Ms. Holmes left you in part to protect Suri from
20 Scientology?
21     A. Listen, I find that question offensive. I find
22 it -- those statements offensive. And like with any
23 relationship, there are many different levels to it.
24 You know, I -- I find it very offensive. There is no
25 need to protect my daughter from my religion.

**Page 111**

1     Q. Okay. My question to you, and I apologize if
2 you find it offensive. And again, I repeat, I'm sorry
3 we're here. I don't want to be here. My client doesn't
4 want to be here. They don't think that this warrants a
5 litigation. But --
6     A. I believe it does.
7     Q. I know you do, that's why we're here.
8     A. Yes. Yes.
9     Q. But unfortunately, we are here and you have to
10 answer the questions. And the question is whether you
11 believe the published contentions that Katie Holmes left
12 you in part to protect Suri from Scientology, whether
13 those are false?
14     A. Do I believe that?
15     Q. Do I believe -- do you believe that that is a
16 false statement?
17     A. I believe it is a false statement.
18     Q. And Ms. Holmes has never indicated in any way
19 that that was one of the reasons that she left you?
20     A. That is -- that she left me because of?
21     Q. To protect Suri from Scientology.
22     A. Did she say that? That was one of the
23 assertions, yes.
24     Q. So those publications were not false?
25     A. I mean I -- those publications I don't know --

**Page 112**

1 first of all, I don't know everything that they said in
2 that, and there are many different other aspects to the
3 divorce.
4     Q. Is Suri currently practicing Scientology?
5     A. No.
6     Q. From the time Ms. Holmes filed for divorce in
7 late June, to your knowledge has Suri practiced
8 Scientology?
9     A. Here's again, when you say "practiced
10 Scientology," it shows a lack of understanding and
11 respect towards my religion. Let me just --
12     Q. I --
13     A. I understand that. I just --
14     Q. I do not mean any disrespect, Mr. Cruise.
15     A. I -- I understand that.
16     Q. And maybe I'm using -- maybe you can tell me,
17 when someone is --
18     A. That's why I am --
19     Q. -- participating --
20     A. Let me finish, please.
21     Q. Okay. Absolutely.
22     A. Let me finish. I let you finish.
23     Q. Absolutely.
24     A. Let me finish.
25     Q. Absolutely. You learn very well.

**Page 113**

1     A. Getting the hang of this.
2         It shows a lack of respect and understanding
3 for my religion. That is understandable in that it is a
4 minority religion. People don't know and understand,
5 and of course the way things are reported or taken out
6 of context, like many things, can create this kind of
7 sense of what something is as opposed to people going
8 and finding out and knowing about it themselves.
9         To a child Scientology is -- it's not
10 something -- look, it's hard to sit here and say, you
11 know, there is not -- in the Catholic Church there is,
12 you know, you have the First Communion. You have, you
13 know, Bat Mitzvahs, Bar Mitzvahs in Judaism. Certainly
14 there are religious rites, but very much so it's about
15 the application of something or doing -- it's not --
16 you -- it's an applied religious philosophy, meaning
17 it's something that you study, you learn, and you apply
18 to the degree that -- and each individual has a level of
19 application that they want to apply. Just because
20 someone, you know -- so when you're talking about a
21 seven-year-old, you know, it's not the same thing as --
22 as Catholicism or Judaism. It's just it's different.
23 It's a different kind of thing.
24     Q. Okay.
25     A. So is -- but, you know, to say that even Suri

29 (Pages 110 to 113)