UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TOM CRUISE,
          Plaintiff,

    vs.                      Case No. CV 12-09124
                                (DDP)(JCX)
BAUER PUBLISHING COMPANY, L.P.,
BAUER MAGAZINE L.P., BAUER MEDIA
GROUP, INC., BAUER, INC.,
HEINRICH BAUER NORTH AMERICA,
INC., and DOES 1-10,
inclusive,
          Defendants.

_____

\*\*\* CONFIDENTIAL - ATTORNEYS' EYES ONLY \*\*\*

VIDEOTAPED DEPOSITION OF TOM CRUISE

September 9, 2013

9:04 a.m.

1900 Avenue of the Stars, 21st Floor

Los Angeles, California

REPORTED BY:

Jean F. Holliday

CSR No. 4535, RPR, CRR

Page 1

Tom Cruise

### Page 2

```
 1  APPEARANCES:
 2
       For the Plaintiff:
 3
         GREENBERG GLUSKER FIELDS CLAMAN MACHTINGER
 4       BERTRAM FIELDS
         1900 Avenue of the Stars, Suite 2100
 5       Los Angeles, California 90067
         310.201.7454
 6       310.553.0687 Fax
         bfields@greenbergglusker
 7
       -AND-
 8
         GREENBERG GLUSKER FIELDS CLAMAN MACHTINGER
 9       AARON J. MOSS
         1900 Avenue of the Stars, Suite 2100
10       Los Angeles, California 90067
         310.553.3610
11       310.201.2314 Fax
         amoss@greenbergglusker.com
12
       For the Defendants:
13
         DAVIS WRIGHT TREMAINE LLP
14       ELIZABETH A. McNAMARA
         1633 Broadway, 27th Floor
15       New York, New York 10019-6708
         212.489.8230
16       212.489.8340 Fax
         lizmcnamara@dwt.com
17
       -AND-
18
         DAVIS WRIGHT TREMAINE LLP
19       DEBORAH ADLER
         1633 Broadway, 27th Floor
20       New York, New York 10019-6708
         212.489.8230
21       212.489.8340 Fax
         deborahadler@dwt.com
22
     Also Present:
23
       GREGORY A. WELCH, GENERAL COUNSEL BAUER
24     PUBLISHING GROUP
       STAN BEVERLY, VIDEOGRAPHER
25
```

### Page 3

```
 1            INDEX TO EXAMINATION
 2            WITNESS: TOM CRUISE
 3
 4   EXAMINATION                          PAGE
 5   By Ms. McNamara:                       7
 6
 7
 8            INFORMATION REQUESTED
 9              Page    Line
10               68      15
11
12            DOCUMENTS REQUESTED
13              Page    Line
14              (NONE)
15
16            WITNESS REFUSED TO ANSWER
17              Page    Line
18              108      25
```

### Page 4

```
 1          INDEX TO CONFIDENTIAL EXHIBITS
 2                  TOM CRUISE
 3       Tom Cruise vs. Bauer Publishing Company
 4            Monday, September 9, 2013
 5       Jean F. Holliday, CSR No. 4535, RPR, CRR
 6
 7  MARKED        DESCRIPTION                PAGE
 8  Exhibit 100   July 23, 2012 letter to Gregory    62
                  Welch and Dan Wakeford, from
 9                Aaron J. Moss; document titled
                  "Society of Professional
10                Journalists Code of Ethics"; and
                  a July 26, 2012 letter to Aaron
11                Moss from Gregory A. Welch
                  (Bates Nos. TC000353 - 356)
12
    Exhibit 101   E-mail string dated August 8,      64
13                2011
                  (Bates Nos. TC003350 and 3351)
14
    Exhibit 102   December 14th, 2012 letter to      70
15                Ms. McNamara from Mr. Fields,
                  two pages
16
    Exhibit 103   Printouts from The Wrap website,   74
17                14 pages
18  Exhibit 104   E-mail string dated November 6,    80
                  2012 and August 2, 2013, four
19                pages
20  Exhibit 105   Copy of a New York Post article    85
                  titled "Tom Rips 'Nazi'
21                Diagnosis," dated June 12, 2008,
                  one page
22
    Exhibit 106   Two-page printout from            100
23                www.scientology.org titled
                  "Scientology. What Does
24                'Suppressive Person' Mean"?
25
```

### Page 5

```
 1          INDEX TO EXHIBITS (Continued)
 2  MARKED       DESCRIPTION                 PAGE
 3  Exhibit 107  Copy of a cover of Vanity Fair   117
                 magazine from 2006
 4
    Exhibit 108  Chart showing schedules         131
 5               (Bates Nos. TC002814 - 2833)
 6  Exhibit 109  Document titled "Avjet           143
                 Corporation Passenger Itinerary
 7               1 January 2011 to 5 July 2012"
                 (Bates Nos. TC002834 - 2836)
 8
    Exhibit 110  Redacted phone bills            179
 9               (Bates Nos. TC002795 - 2800,
                 2791 - 2794, 2801, 2811 - 2813,
10               2790, 2808 - 2810, 2805 - 2807,
                 2802 - 2804)
11
    Exhibit 111  E-mail string dated July 17,    197
12               2012
                 (Bates No. TC003147)
13
    Exhibit 112  Series of e-mails               200
14               (Bates Nos. TC000835, 836, 936,
                 937 and 918)
15
    Exhibit 113  E-mail string dated September   203
16               15, 2012
                 (Bates No. TC003140)
```

2 (Pages 2 to 5)

U.S. LEGAL SUPPORT
(800) 993-4464

EXHIBIT 26

98

```
 1       LOS ANGELES, CALIFORNIA;
 2       MONDAY, SEPTEMBER 9, 2013, 9:04 A.M.
 3
 4              TOM CRUISE,
 5       having been first duly sworn, was
 6       examined and testified as follows:
 7
 8              EXAMINATION
 9
10       THE VIDEOGRAPHER: Good morning. We're on the
11   record. This is the video recorded deposition of Tom
12   Cruise in the matter of Tom Cruise versus Bauer
13   Publishing Company, et al., taken on behalf of the
14   defendant. This deposition is taking place at 1900
15   Avenue of the Stars, Los Angeles, California, on
16   September 9th, 2013, at approximately 9:04 a.m.
17       My name is Stan Beverly. I'm the videographer
18   with U.S. Legal Support located at 11845 West Olympic
19   Boulevard, Los Angeles, California.
20       Video and audio recording will be taking place
21   unless all counsel have agreed to go off the record.
22       Would all present please identify themselves
23   beginning with the witness.
24       THE WITNESS: Tom Cruise.
25       MR. FIELDS: And I am Bert Fields, one of the
                                                   Page 6
```

```
 1   lawyers for Mr. Cruise.
 2       MR. MOSS: Aaron Moss, also for Mr. Cruise.
 3       MS. McNAMARA: Elizabeth McNamara for the
 4   defendants, along with my colleague Deborah Adler.
 5       MR. WELCH: And Greg Welch also for the
 6   defendants.
 7       THE VIDEOGRAPHER: The certified court reporter
 8   is Jean Holliday.
 9       Would you please swear in the witness.
10
11              TOM CRUISE,
12       having been first duly sworn, was
13       examined and testified as follows:
14
15              EXAMINATION
16
17   BY MS. McNAMARA:
18       Q. Good morning, Mr. Cruise.
19       A. Good morning.
20       Q. Thank you for coming. It's a standard
21   question, so --
22       A. Uh-huh, sure.
23       Q. -- don't take offense, but I need to ask you to
24   begin whether you're taking any medication or anything
25   that would impede your ability to speak --
                                                   Page 7
```

```
 1       A. No.
 2       Q. -- honestly?
 3       A. No.
 4       Q. And truthfully?
 5       A. None.
 6       Q. Have you had your deposition taken before?
 7       A. Yes, I have.
 8       Q. And on how many occasions?
 9       A. I don't know. One, two, three, the one for Bob
10   Towne in the writing thing. Maybe four, something like
11   that.
12       Q. Okay. In what actions were they?
13       A. One was a lawsuit with Sephora, I think. I
14   don't know. I don't.
15       MR. FIELDS: I don't get to answer.
16   BY MS. McNAMARA:
17       Q. Mr. Cruise, don't look --
18       A. Oh, sorry. Sorry.
19       Q. -- to your counsel to answer.
20       A. You know what, I -- I honestly --
21       Q. He's not here to testify.
22       A. Sorry about that. You know, Bert can tell you.
23   I don't really --
24       Q. You don't remember any -- any action that you
25   testified in?
                                                   Page 8
```

```
 1       A. No. There is a few that I testified in. There
 2   was one for SAG, for -- I guess for Bob Towne. There
 3   was a lawsuit that we had I think with Phillips years
 4   ago, and there was a recent case.
 5       Q. Involving Mr. Sapir?
 6       A. Yes. Yes, I think so.
 7       Q. And that testimony occurred last year; is that
 8   correct?
 9       A. We just did it recently, yes.
10       Q. I want you to -- if for any reason you don't
11   understand one of my questions, I want you to tell me
12   that you don't understand it.
13       A. Certainly.
14       Q. If you don't do so, then we'll assume for the
15   record that you did understand the question.
16       A. Certainly.
17       Q. Okay? Did you do anything to prepare for this
18   deposition?
19       A. Met with Bert and Aaron yesterday.
20       Q. Okay. For how long?
21       A. Probably talked about it for about an hour.
22       Q. Okay. Did you look at any documents?
23       A. Just reviewed the covers again of the
24   magazines.
25       Q. Did you review the articles?
                                                   Page 9
```

3 (Pages 6 to 9)

**Page 94**

1  When I say "asserting a claim" I mean sending a
2  claim letter saying: You should retract this, you need
3  to -- you know, we're threatening to sue.
4      A. Uh-huh.
5      Q. It's short of lawsuit. Okay?
6      A. Yes.
7      Q. So with that understanding as -- as to
8  asserting a claim --
9      A. Yes.
10     Q. -- do you recall that your lawyers have
11 asserted claims concerning coverage about Suri prior
12 to --
13     A. Yes.
14     Q. -- the --
15     A. Yes.
16     Q. -- articles --
17     A. Yes. Thank you.
18     Q. -- at issue in this litigation?
19     A. Yes, I do. Yes.
20     Q. And one of them was about secret auditing of
21 Suri. Do you recall that?
22     A. I don't recall all of them, no.
23     Q. Or that you were creating a wedge between Katie
24 and Suri?
25     A. I don't recall all those.

**Page 95**

1      Q. Or that Suri was kept in a windowless room at
2  one of your homes?
3      A. I remember stuff when Suri was born, I do. I
4  don't know if it was specifically that, but I do recall
5  some of those kinds of statements.
6      Q. Before a claim letter is sent do you approve
7  the claim letter?
8      A. No, not all of them.
9      Q. Do you read the applicable articles that are
10 being challenged?
11     A. I get briefed on them or I read them, yes.
12     Q. And again, I think you testified to this, and I
13 apologize if I'm asking you to repeat it, but when you
14 say you get briefed on it, that's by Amanda Lundberg?
15     A. By Amanda or if it's a legal thing I'll call
16 Bert, discuss it with my counsel.
17     Q. Okay. Now, there came a time, Mr. Cruise, that
18 you and your wife separated; is that right, Katie
19 Holmes?
20     A. Where she filed divorce.
21     Q. Yes. And that was at the end of June 2012?
22     A. Yes.
23     Q. And since the divorce -- or rather since prior
24 to that time, from June 18th of 2012 until Thanksgiving
25 of 2012, you only saw Suri a few times; isn't that

**Page 96**

1  right?
2      A. Yes.
3      Q. I think your counsel have produced documents in
4  this litigation that includes your schedule and
5  travel --
6      A. Yes.
7      Q. -- and the like. And according to those
8  records you, during that period of time of June 18th
9  until Thanksgiving of 2012, you saw your daughter for 10
10 days.
11     A. I don't know the total number of days.
12     Q. Does that sound right?
13     A. I don't know. I'd have to look at it.
14     Q. They were the three days of July 17th to the
15 19th, when you came into New York, and then you went out
16 to the Hamptons. Do you recall that?
17     A. Yes, I do.
18     Q. Okay. You saw her for 12 hours on July 26, or
19 approximately thereof. Do you recall that? You were
20 flying from London to L.A. and you stopped in New York
21 for --
22     A. Yes.
23     Q. -- about 12 hours?
24     A. Yes.
25     Q. And then there were the six days,

**Page 97**

1  approximately, when you came to New York and picked up
2  Suri and you took her to Disney World?
3      A. Uh-huh.
4      Q. Do you recall that?
5      A. Yes, I do.
6      Q. So if you add those up, those are generously 10
7  days.
8      A. Okay.
9      Q. Do you have any reason to dispute that
10 calculation?
11     A. None.
12     Q. Prior to your divorce with Ms. Holmes was
13 Ms. Holmes close with your other children, Connor and
14 Isabella?
15     A. Yes.
16     Q. And was she close with your sisters?
17     A. Fairly, yes.
18     Q. One or more of your sisters lived in the home;
19 is that right?
20     A. At one point Cass did when we were living on
21 Alpine.
22     Q. Okay. But the other sisters don't -- you have
23 three -- is it correct you have three sisters?
24     A. Three sisters.
25     Q. Do they all live in Los Angeles?

25 (Pages 94 to 97)

Tom Cruise

Page 134

1  Q. And do you use the same security detail, or do
2  you change from location to location?
3  A. You know, that's -- I really don't know. I
4  don't run -- I'm not overseeing all the security.
5  Depends on the studio, who they want.
6  Q. So the studio supplies the security, in your
7  experience?
8  A. Yeah, in different -- in different times, like
9  I guess when I'm on a -- on a movie I think the
10 economics of it are that the studio pays the security
11 for that.
12 Q. And do you know whether they keep records as to
13 your whereabouts?
14 A. I don't know.
15 Q. Have you ever seen records documenting your
16 whereabouts on any particular day from security?
17 A. No. I never asked.
18 Q. In connection with this litigation do you know
19 whether there was any attempt to obtain logs of
20 security, security logs regarding your whereabouts
21 during any particular period of time?
22 A. No.
23 Q. No, there was no such attempt?
24 A. No, I don't know if there was such attempt.
25 Q. If you look at the schedule, or this document

Page 135

1  that's been marked Exhibit 108, on the pages that have
2  Bates stamps that are 2814 to 2815, the first two pages.
3  A. 28 -- oh, I see that at the bottom, 2814 to
4  what, please?
5  Q. The next page, 2815.
6  A. Uh-huh.
7  Q. During much of this period of time you were
8  shooting MIGP?
9  A. Uh-huh.
10 Q. Can you say what MIGP is?
11 A. Mission: Impossible - Ghost Protocol.
12 Q. And much of that shooting was occurring in
13 Vancouver; is that right?
14 A. At this time period, yes, I guess.
15 Q. And if you look at this record it documents
16 that Ms. Holmes and Suri were often on location.
17 A. Yes.
18 Q. Is that right?
19 A. Yes.
20 Q. And was that a common practice during that
21 period of time, 2011, that Ms. Holmes and Suri would be
22 on location with you?
23 A. I mean they were in and out, absolutely.
24 Q. I mean from our review of this schedule it
25 appears that from January to May -- January 2011 to May

Page 136

1  2012 there were only a few instances when you were away
2  from Suri for more than a week. Does that ring true to
3  you?
4  A. If it -- it doesn't ring untrue to me.
5  Q. Okay. And is that consistent with your memory?
6  A. Yes.
7  Q. And I assume, as would be indicated from that,
8  that it was important for you to see Suri, wasn't it?
9  A. Yes.
10 Q. And you believed it was important for her as
11 well?
12 A. Yes.
13 Q. And I assume when you were away from her she
14 missed you?
15 A. Yes.
16 Q. Did -- during -- during those times when you
17 were away from her, did Ms. Holmes ever indicate to you
18 that Suri was upset or that she missed you, do you
19 recall?
20 A. No.
21 Q. But you would agree with me, I assume, that
22 it's important to physically be with a child when you
23 can; isn't that right?
24 A. I do.
25 Q. And especially a child that's young, like four

Page 137

1  or five, six years old, they can't communicate by e-mail
2  with you, can they?
3  A. No.
4  Q. And they can't text you, can they?
5  A. No.
6  Q. And so if you're not there, the only means of
7  communication is telephone; isn't that right?
8  A. Yes, it is.
9  Q. And telephone is to some degree a poor
10 substitute for physically being there, isn't it?
11 A. No question.
12 Q. I mean I remember my daughter when she was that
13 age, she wasn't much of a conversationist when I got on
14 the phone.
15 A. You have to work at it. I've gotten very good
16 at it. I've gotten very good at it. I tell wonderful
17 stories and they like hearing it.
18 Q. Well, that's nice.
19 A. Yes.
20 Q. But you don't often -- it really doesn't
21 substitute for being able to hug them, does it?
22 A. No, it doesn't.
23 Q. And in my experience when you talk to a young
24 child like that on the phone they often get distracted.
25 A. Yeah, they do, but as I said, I've gotten

35 (Pages 134 to 137)

U.S. LEGAL SUPPORT
(800) 993-4464

EXHIBIT 26

101

### Page 138

1  pretty good at communicating, and I also find that, you
2  know, Suri, you know, is a very happy child, and
3  confident and has a good sense of herself.
4      Q. And there were times in this period, according
5  to this schedule, when Ms. Holmes was traveling and Suri
6  was alone with you. Is that accurate?
7      A. Yes.
8      Q. And now direct your attention to Page 2821 of
9  this schedule. On this page for much of the time it
10 indicates your schedule is that you're filming OS?
11     A. Uh-huh, One Shot.
12     Q. That was going to be my question.
13     A. Yes.
14     Q. The movie was One Shot?
15     A. Yes. We changed the title to Reacher.
16     Q. To what?
17     A. To Reacher.
18     Q. Yeah, I was going to say, I don't remember One
19 Shot coming out.
20     A. No.
21     Q. I don't think they'd throw away one of your
22 films.
23     A. No. No.
24     Q. They spent a lot -- too much money on it.
25     A. They should, they should throw away a few of

### Page 139

1  them, but I don't feel that way.
2      Q. If you -- if you direct your attention to a
3  little after the middle of the page, the Saturday,
4  October 15th, do you see that, Mr. Cruise?
5      A. Yes.
6      Q. It indicates that -- that you were filming on
7  Friday in Pittsburgh, Pennsylvania, and then you flew to
8  London.
9      A. Yes.
10     Q. Do you see that?
11     A. Yes.
12     Q. And then the next day, on October 15th, you
13 were in London?
14     A. Yes.
15     Q. And it says you were at an IAS event.
16     A. Uh-huh.
17     Q. What is that?
18     A. That's an International Association of
19 Scientology. It's an international event that we have
20 for our Church.
21     Q. And were you speaking at that event?
22     A. No, I was not.
23     Q. So you were just attending?
24     A. Yes.
25     Q. And then according to this schedule you

### Page 140

1  returned to Pittsburgh on Sunday, October 16th, and
2  returned to filming?
3      A. Yes.
4      Q. Do you see that?
5      A. Yes, I do.
6      Q. Do you know whether they had to shut down
7  filming of One Shot because you flew out on Friday then
8  returned on Sunday?
9      A. No, they did not.
10     Q. And you believed it was important that you
11 attended that event, didn't you?
12     A. Yes.
13     Q. Why was it important to you?
14     A. It was an important event. I felt it was
15 important.
16     Q. It's an annual event?
17     A. Yes, it is.
18     Q. Is it more than once -- do they have such
19 events more than once a year?
20     A. That is an international annual event, yes.
21     Q. But based upon this, you could fly from the
22 East Coast to London for 24 hours; is that right?
23     A. In that situation, yes.
24     Q. And you did that for the Church event --
25     A. Yes.

### Page 141

1      Q. -- did you not? But you didn't do it for Suri;
2  isn't that right?
3      A. When did I not do it for Suri?
4      Q. In July, August, September, October.
5      A. That's not true.
6      Q. You didn't --
7      A. In July I did fly to see my daughter.
8      Q. I know, but I'm talking about from -- let's
9  take -- let's take the dates from August 8th until
10 Thanksgiving.
11     A. Different situation.
12     Q. There was no 24-hour -- there were no 24-hour
13 period of time there that you couldn't have flown to see
14 Suri?
15     A. Listen, when there is a divorce -- if you look
16 at this also in terms of Suri coming to me and certain
17 agreements that you have, when a divorce occurs things
18 change. And it's more complicated, as everyone knows
19 when that is, when that occurs, and there are certain
20 agreements; now you have to ask for permission and
21 organize schedules to make things happen. So it
22 wasn't -- it's not an ideal scene. It's not an ideal
23 situation.
24     Q. And you were in part responsible for that
25 absence, weren't you?

36 (Pages 138 to 141)

### Page 142

1  A. No.
2  Q. In no way?
3  A. No.
4  Q. You couldn't have -- you were unable to fly for
5  24 hours from London to New York?
6  A. Yes.
7  Q. And why were you unable, Mr. Cruise?
8  A. There are many different circumstances. One,
9  first of all, at this point when you're looking at --
10 you can't compare Reacher to All You Need Is Kill or
11 Edge of Tomorrow. And the situation, you know, when
12 you're thinking of your child and thinking what is the
13 best thing for them, and of course respecting Kate's
14 wishes in terms of Suri's scheduling, the nature of
15 making that film, the nature of having finished one film
16 and kind of -- agreements change, you know. That wasn't
17 how the thing was set up. As I said, things change.
18 Things change. And certainly what doesn't change is the
19 love that I have for my daughter, the fact that I didn't
20 abandon her emotionally, physically or otherwise. And
21 in terms of how I feel about her in terms of the
22 responsibility that I feel towards my child is not -- is
23 not waned in any way.
24 Q. Okay. We'll -- we'll get into a little more
25 about that time period.

### Page 143

1  A. Sure, please.
2  Q. And what you're -- what you were capable of
3  doing.
4  A. Thank you.
5     MS. McNAMARA: Okay. Let me mark a document
6  that was provided to us in this litigation, it's called
7  a Passenger Itinerary. And we'll have that be 109.
8  It's Bates stamped TC 2834 through TC 2836.
9     (Exhibit 109 marked)
10 BY MS. McNAMARA:
11 Q. Have you seen this document before, Mr. Cruise?
12 A. No, I have not.
13 Q. Do you know how it was obtained --
14 A. No, I do not.
15 Q. -- or who created it?
16    Have you heard of the corporation called Avjet?
17 A. Yes.
18 Q. What's that?
19 A. That's a company that handles the -- my
20 airplane.
21 Q. And when you say "my airplane," do you own an
22 airplane?
23 A. Yeah, other airplanes. Yes, I do.
24 Q. And when you --
25 A. I own it through a corporation.

### Page 144

1  Q. Okay. And when you fly on Avjet you're flying
2  your plane?
3  A. Most of the time, yes. If my plane isn't
4  available I'll use Avjet or the studio will use it for
5  other airplanes.
6  Q. Okay. And who books your flights, do you know?
7  A. What do you mean by that?
8  Q. Well, who calls up and arranges that you want
9  to fly on X date and go to location Y, do you do that
10 personally or does Cass or --
11 A. Cass, I think Cass does that.
12 Q. And do you -- is it fair to say that you pretty
13 much consistently fly your own plane or private planes?
14 A. Yes.
15 Q. Do you ever fly commercial?
16 A. I flew commercial from Dubai.
17 Q. To where?
18 A. To Los Angeles.
19 Q. Is that the only time it occurs to you in the
20 last three or four years?
21 A. Yes.
22 Q. Do you agree that it's faster to fly a private
23 jet versus commercial?
24 A. Well, generally it's easier, yes.
25 Q. It's -- I mean you don't have to like us plebes

### Page 145

1  who have to stand in security lines.
2  A. You got to go through security, it does save --
3  it does save time. Sometimes the flight itself is
4  longer if you have, you know -- but yeah, it's better.
5  It's much more comfortable.
6  Q. Looking at what's been marked as Exhibit 109,
7  do you have any reason to doubt the accuracy of this
8  document?
9  A. I have no reason to believe it's inaccurate.
10 Q. Okay. The flight I was referring to earlier
11 appears on the first page when you flew from Pittsburgh,
12 PA, to London and then -- on the 14th of October and
13 then on the 16th of October you flew back from London to
14 Pittsburgh. Do you see that?
15 A. I do now, yes.
16 Q. Do you -- do you have a sense, having flown a
17 fair amount from the East Coast to London, how many
18 hours it takes you to do that?
19 A. I mean it depends on headwinds, I guess. I
20 don't know. Eight, nine, ten, 11 hours.
21 Q. You fly planes yourself, don't you?
22 A. Yes. I'm a pilot.
23 Q. Do you own smaller planes that you fly, or do
24 you fly your personal jet that you keep at --
25 A. No. I fly smaller airplanes, war birds and

37 (Pages 142 to 145)

U.S. LEGAL SUPPORT
(800) 993-4464

EXHIBIT 26

103

**Page 146**

1 aerobatics.
2 Q. Now, as indicated on Exhibit 109 on Page 28 --
3 28? Let me see. Or is this the -- sorry. I'm back on
4 Exhibit 108. If you turn to the page that has the Bates
5 stamp 2828, which is pretty far into the document.
6 About June 8th is --
7 A. Yes.
8 Q. -- shortly down the document. It indicates
9 that you flew from L.A. overnight to the UK, spent
10 Saturday, June 9th, in London for the Rock of Ages
11 premiere.
12 A. Yes.
13 Q. And then on Sunday, June 10th, you flew from
14 London to New York City to meet Suri.
15 A. Yes.
16 Q. Do you recall that?
17 A. Yes.
18 Q. And again, to your knowledge did the flight
19 from London to New York, did that take about seven
20 hours?
21 A. I don't know how long the flight was
22 specifically.
23 Q. It would be within that range, wouldn't it,
24 generally?
25 A. I'm not sure. Depends on winds. Could be

**Page 147**

1 eight, nine hours, whenever.
2 Q. Did you consider at the time attending the UK
3 premiere to be important?
4 A. It's an obligation.
5 Q. And during this period of time you were filming
6 Oblivion; is that right?
7 A. Yes.
8 Q. Do you know with taking that 36-hour trip, or
9 48-hour trip, did they shut down Oblivion, filming of
10 Oblivion for that trip?
11 A. I'm not sure. I don't know what happened. I'd
12 have to refer to it.
13 Q. Do you have any reason or recollection that
14 they did shut down filming in order for you to go to UK?
15 A. I know the studios work out, negotiate time for
16 me to fulfill the obligations.
17 Q. Okay.
18 A. So I don't know if they shut down or what
19 happened at that point. I'd have to refer --
20 Q. I mean it's really --
21 A. -- back and think about it.
22 Q. I'm sorry.
23 A. No. I'd have to refer back and think about it.
24 Q. Okay. So but it's -- it's possible in your
25 experience for them to continue on doing other things on

**Page 148**

1 the film if you're gone; isn't that right?
2 A. It's organized ahead of time, yeah.
3 Listen, there is -- I know a lot of people feel
4 that -- and I get questions, you know, isn't memorizing
5 the hardest thing about making movies?
6 Q. Uh-huh.
7 A. And particularly someone in my case and having
8 produced films, the responsibility that I have, even if
9 I'm not producing, because I've produced so many films,
10 me starting a film with a studio is -- they are
11 expecting the full body of knowledge and, you know, they
12 are expecting all of that. So there is much more that
13 goes into a film instead of just a day of shooting or a
14 day of filming. Even if I'm not there physically, there
15 is a level of responsibility that I have for the
16 schedule, for the budget, for the preparation, for the
17 storytelling, the structure, for the kind of guidance
18 and support of every department.
19 And each film has different kinds of demands,
20 both physically and mentally, and whereas a One Shot is
21 much different than a Rock of Ages, there is different
22 physical requirements. There is different physical kind
23 of stamina and preparation. Sometimes I've spent
24 months, a year, sometimes two years preparing for a
25 single film, and each one is different. And during this

**Page 149**

1 time period, you know, particularly when I'm going into,
2 you know, the films that were lined up from Reacher,
3 from -- I guess it was Mission: Impossible, Rock of
4 Ages, Reacher, Oblivion, and then into All You Need Is
5 Kill, that eventually is to be called Edge of Tomorrow,
6 that, you know, it's -- like even now, I mean we talked
7 about lunch, I have to watch specifically what I eat for
8 inflammation and different things that you have to do
9 physically to prepare for a film, and that's for some
10 people, you know, it's -- I train, you know, I've
11 studied, you know, professional athletes, Olympians in
12 order to, you know -- a sprinter for the Olympics, they
13 only have to run two races a day. When I'm shooting I
14 could potentially have to run 30, 40 races a day, day
15 after day.
16 So each film has a different kind of demand
17 with schedule. So even if I'm not shooting on those
18 days, there is communication with those things and
19 responsibility towards that particular project.
20 Q. And as I understand your last answer, which I
21 appreciate, you take all that very seriously, don't you?
22 A. I'm responsible not only for myself but for my
23 crew, the studio, it kind of spreads out to thousands
24 and thousands of people.
25 Q. Sure. And those responsibilities as you've

38 (Pages 146 to 149)

**Page 162**

1  Q. Okay. And in order to make that happen you
2  adjusted your schedule so that you stopped over in
3  Newark; isn't that right? Because that was an important
4  event, wasn't it?
5  A. Yes, I did.
6  Q. Okay. Now -- do you want to take a break?
7  A. No. I'm fine.
8  Q. You're sure?
9  A. Yeah.
10  Q. I'm happy to.
11  A. No. I'm good.
12  Q. Okay. Now, moving to August of 2012 those --
13  we've touched on previously that you had about six days
14  when you took Suri to Disney World.
15  A. Yes.
16  Q. And you dropped her off, according to this
17  schedule, on Saturday, August 4th; is that right?
18  A. I don't know the exact dates of that. If the
19  schedule says it, I don't have any disagreement with it.
20  Q. Okay. And then from August 4th until August
21  20th you were not filming; is that right?
22  A. I was not filming, I guess not, no.
23  Q. And you were spending that time in Los Angeles.
24  You stayed in Los Angeles until August 20th, according
25  to this schedule.

**Page 163**

1  A. I don't have a disagreement with that.
2  Q. Okay. When you flew from Burbank to London on
3  the 20th, or the 19th, I'm not sure which day you
4  flew -- you flew from -- you flew on August 20th,
5  according to your Avjet. Is there a reason you didn't
6  stop over in New York to see Suri again?
7  A. As I said, things change and there is different
8  agreements, like in any divorce, where now you work out
9  schedules. It's just a different set of circumstances.
10  It certainly does not mean that I've abandoned my
11  daughter.
12  Q. That wasn't my question, Mr. Cruise.
13  A. I understand, but --
14  Q. My question was, it was a decision you made,
15  did you not?
16  A. No, not necessarily.
17  Q. Did you ask --
18  A. I'd have to recall.
19  Q. -- to stop over at that time?
20  A. There is certain agreements that we have in
21  visitation.
22  Q. What are the agreements that you have about
23  visitation?
24  A. I'll have to go through it.
25  Q. Did the agreements prevent you from seeing your

**Page 164**

1  daughter for over 100 days?
2  A. Over 100 days?
3  Q. Uh-huh. From August 4th until Thanksgiving you
4  did not see your daughter.
5  A. No, I understand that.
6  Q. If you count those days, it's over 100 days.
7  A. Yes.
8  Q. Does your agreement with Ms. Holmes regarding
9  visitation, would it have prevented you from seeing your
10  daughter during that period of time?
11  A. I would have had to have at specific times
12  flown from London to New York.
13  Q. Okay. And that was something that was
14  impossible to do?
15  A. Unfortunately, in this situation it was
16  impossible.
17  Q. Now, when you got to -- according to this
18  schedule, when you got to London on August 20th -- and
19  again, I suspect you're not going to be able to answer
20  this question, so it might be a question that your
21  counsel will have to answer since we were not provided
22  with any backup concerning this document, but for the
23  next -- if you look at that Page 2830, it now just says
24  AYNIK for your schedule for every day.
25  A. All You Need Is Kill, yes.

**Page 165**

1  Q. Whereas prior pages would differentiate what
2  you were doing, you were shooting, you were wrap, you
3  were in preparation, you were doing voice lessons, you
4  were doing -- they were very specific about what you
5  were doing, and when it gets to All You Need Is Kill for
6  the pages of Exhibit 108, 2830 through 28 -- top of
7  2833, it doesn't provide us with any detail as to what
8  you were doing on All You Need is Kill. Do you know why
9  that is?
10  A. I don't know why that is. I don't know why.
11  Q. Would there be documentation, scheduling, call
12  sheets, whatever, that would be able to substantiate
13  what you were doing on those days?
14  A. I don't know.
15  Q. Kind of knowing how your schedule works, do you
16  get like an e-mail in the morning about okay, this is
17  the call sheet for today, or are you physically sent
18  something? How do you get it?
19  A. Sometimes it's verbal as we're going through
20  it. Just day to day, I can tell you day to day it was a
21  significant amount of work. All You Need Is Kill is an
22  incredibly grueling and ambitious film. The nature of
23  the movie, it's an epic picture, and when you look at
24  the nature of the photos of what we were attempting to
25  do with practical in-camera action, it just so happened

42 (Pages 162 to 165)

**Page 170**

1 evenings in London when you were there; isn't that
2 right?
3    A. A few number of evenings.
4    Q. You went to birthday parties?
5    A. I don't recall going to --
6    Q. Or a birthday party?
7    A. I don't recall going to a birthday party.
8    Q. Cameron Diaz's party?
9    A. I didn't go to Cameron Diaz's birthday party.
10    Q. You didn't?
11    A. You've been reading the press. You can't
12 believe everything you read.
13    Q. Well, sometimes photographs tell a story.
14    A. You can't believe everything you read though.
15 Photographs do not tell a story. They are
16 reinterpreted, as we can see from the cover of this
17 magazine.
18    Q. Well, actually I think on that particular thing
19 then your lawyers, who were acting as your PR agent at
20 that time, confirmed it, or your PR agent did, that you
21 were with Cameron Diaz for her birthday.
22    A. I did not go to Cameron Diaz's birthday party.
23    Q. Okay. In August, I believe, you learned that
24 Suri was going to go to Avenues, the school; is that
25 right?

**Page 171**

1    A. No. Before that Kate had discussed it with me.
2    Q. And do you recall when you learned when she was
3 going to have her first day of school?
4    A. I don't recall the first moment that I heard.
5    Q. Do you have any recollection having any
6 discussion about Suri's first day of school?
7    A. Yes. Kate and I both knew that I wouldn't be
8 able to be there.
9    Q. And do you recall any discussion with her about
10 whether -- whether she wanted you to be there, whether
11 Suri wanted you to be there?
12    A. Suri never mentioned it.
13    Q. She never mentioned that she wanted her daddy
14 to be there --
15    A. No.
16    Q. -- for her first day of school?
17    A. No, she didn't.
18    Q. She hadn't been to school before, had she?
19    A. No.
20    Q. So this was truly her first day of school?
21    A. Yes.
22    Q. Unlike most of the other kids who were starting
23 who were first graders and had been to kindergarten and
24 preschool?
25    A. Yes.

**Page 172**

1    Q. So that would be a big day for a little girl,
2 isn't it?
3    A. I think parents sometimes think it's, you
4 know -- with Suri, if she had asked me to be there I
5 would have been there. I would have tried to make it
6 work out in any way that I could.
7    Q. I see. So because she didn't ask you, you
8 weren't there?
9    A. Well, it's also something where -- I think the
10 press and everyone -- there are many different
11 circumstances with that. One is the circus of Suri's
12 first day of school that the press wanted, and Kate and
13 I discussing kind of what is best and how do we do it,
14 and of course there is a lot of media attention. As I
15 said, everything -- look, we do the best we can to try
16 to think about things and mitigate that stuff as best we
17 can.
18    Q. And did you at that time promise Suri that you
19 were going to be there for the first day of school?
20    A. No. No. Everything with my kids if I promise
21 them I'm going to do something I do it.
22    Q. Would you agree that children experience time
23 differently than adults?
24    A. No. I don't know.
25    Q. I mean do you have any sense as to whether like

**Page 173**

1 three months for a six-year-old feels like, in a
2 six-year-old's world, is an eternity?
3    A. I don't know that to be true.
4    Q. You don't?
5    A. No.
6    Q. Would you agree that many people believe that?
7    A. No.
8    Q. Now, there came a time when Katie suggested to
9 you that you come to New York to see Suri in October;
10 isn't that right?
11    A. Yes.
12    Q. And you didn't do it, did you?
13    A. I couldn't do it.
14    Q. Now, your counsel has publicly equated your
15 absence from Suri for these extended periods of time as
16 being analogous to someone fighting in Afghanistan. Are
17 you aware of that?
18      MR. FIELDS: Object to the form of the
19 question.
20      You may answer.
21 BY MS. McNAMARA:
22    Q. Yeah, you can answer.
23    A. I didn't hear the Afghanistan, but that's what
24 it feels like, and certainly on this last movie, it was
25 brutal. It was brutal.

44 (Pages 170 to 173)

**Page 194**

1 physically absent from your daughter for significant
2 periods of time?
3    A. No.
4    Q. You've never seen any other reports by other
5 publications that you hadn't seen your daughter for --
6    A. I haven't seen them.
7    Q. -- a significant period of time?
8    A. I haven't read them.
9    Q. As you sit here today do you have any reason to
10 believe that that's not the case?
11    A. I beg your pardon?
12    Q. As you sit here today do you have any reason to
13 believe that other publications did not report that you
14 were absent from your daughter for significant periods
15 of time?
16    A. I don't have reason to believe they did or they
17 didn't. I know they haven't -- none of them said that I
18 abandoned my child.
19    Q. Now, are you aware that the week before the
20 first issue that you've challenged in this litigation
21 that Life & Style reported that you were physically
22 absent from Suri?
23    A. No.
24    Q. And that as a result of your absence she was
25 upset and crying a lot?

**Page 195**

1    A. No.
2    Q. Do you know whether anyone issued a complaint
3 to Life & Style about that report?
4    A. I don't know.
5    Q. Do you know whether that report was false?
6    A. Oh, it's absolutely false.
7    Q. Well, it's not false that you were absent.
8    A. No. That my daughter was upset, that's false.
9    Q. Okay. Did your counsel seek a retraction for
10 that publication?
11    A. I don't know.
12    Q. Are you aware that the Mail Online published a
13 headline saying, "Suri and Tom finally," with finally
14 all in caps, "reunite after more than three months
15 apart"? This is on -- in November 22, 2012.
16    A. No.
17    Q. Did you assert a claim based upon that
18 headline?
19    A. Not to my knowledge.
20    Q. Do you know whether you asked for a retraction?
21    A. Not to my knowledge.
22    Q. And it was accurate, wasn't it, that you had
23 been more than three months?
24    A. Yes.
25    Q. Now, in the Playboy interview that I referenced

**Page 196**

1 earlier that came out in June of 2012, right shortly
2 before the divorce, do you recall there that you
3 indicated that your father was mostly absent because he
4 was working?
5    A. I don't recall what I said exactly.
6    Q. Is that true?
7    A. My father worked, he worked, and that my
8 parents were divorced and that I didn't see him.
9    Q. Do you see any similarity?
10    A. Absolutely none. My father didn't pay money.
11 He didn't call.
12    Q. Okay. Do you know whether on July 16th, the
13 day before you came to New York to see Suri for the
14 first time in a month, do you know whether your
15 publicist knew you were coming?
16    A. I'm not sure if she did or not. I might have
17 told her.
18    Q. But as you sit here today you don't know
19 whether you told your publicist that you were coming the
20 next day?
21    A. I don't recall whether I did or I didn't.
22    Q. Do you have any information as to whether she
23 told anybody at Life & Style that you were in fact
24 coming the next day to meet your daughter?
25    A. I have no information on that.

**Page 197**

1    Q. And so you have no reason to believe that she
2 told them that?
3    A. I have no reason to believe that she told or
4 didn't tell. I don't remember. I don't know.
5    Q. Now, when -- when asked about -- let me show
6 you a document that -- no, tab 43. Can we have this
7 marked as Exhibit 111. It's a one-page document Bates
8 stamped TC 3147.
9        (Exhibit 111 marked)
10 BY MS. McNAMARA:
11    Q. This indicates that -- I can show you another
12 document but a representative at Life & Style had
13 reached out to Amanda to make inquiries about their
14 article, including the fact that you hadn't seen Suri
15 for four weeks, and Amanda indicates here, instead of
16 telling them that you in fact were coming the next day,
17 she indicates "I didn't answer Heidi." Do you see that?
18 And she indicates that "They are idiots and morons." Do
19 you see that as well?
20    A. Yes.
21    Q. Did you have an understanding that that's -- I
22 can represent to you is consistent with the tone adopted
23 by Amanda Lundberg often in e-mails with the media?
24        MR. FIELDS: Objection to form of the question.
25        You may answer.

50 (Pages 194 to 197)

U.S. LEGAL SUPPORT
(800) 993-4464

EXHIBIT 26

107

Page 206

1 Particularly at this time I was very, very busy.
2     MS. McNAMARA: Okay. We call for the
3 production of correspondence during this period of time
4 between Mr. Fields and any representatives of Ms. Holmes
5 concerning press contact, and I won't limit that request
6 to Mr. Fields. If there was another representative of
7 the law firm who sent the letter I would seek that
8 correspondence as well.
9     Q. Do you know why -- do you know why Ms. Lundberg
10 would tell emphatically to Bauer that you don't own a
11 plane?
12     MR. FIELDS: Object to the form of the
13 question.
14 BY MS. McNAMARA:
15     Q. Do you know why she would say that?
16     A. No.
17     Q. It's false, isn't it?
18     A. Yes. Maybe she didn't know I owned it. I
19 don't know.
20     Q. Okay. But she didn't ask you, did she?
21     MR. FIELDS: Object to the form of the
22 question.
23     You may answer.
24     THE WITNESS: I don't recall being asked if I
25 owned it or not.

Page 207

1 BY MS. McNAMARA:
2     Q. Now, as I understand this action, but I just --
3 part of my job here is to make sure I understand your
4 Complaint, and what you're complaining about in this
5 action is the use of the word "abandoned" on the covers;
6 is that correct?
7     A. Saying that I abandoned Suri.
8     Q. Okay.
9     A. I abandoned my daughter.
10     Q. Okay. And you're not complaining about
11 anything else that's contained in the articles, are you?
12     A. I really -- look, I don't like the articles. I
13 don't like the fact that it's the cover of these stories
14 and what it says on the cover of these stories. And I
15 know that a lot of people walk past and see that and
16 it's something that is going to be there forever, and I
17 find it absolutely disgusting. And I had asked for a
18 retraction and they wouldn't give it to me. It is
19 something that will be there, unfortunately, forever.
20     And I understand, listen, I am someone who is
21 in the public eye. I am used to a tremendous amount of,
22 you know, misrepresentations, but when it comes to
23 something like that, I find it appalling. Even the fact
24 that you would suggest that I was being like my father,
25 it's the same thing that my father did, and suggesting

Page 208

1 that that's something that I'm doing in terms of
2 abandoning my children, I find that greatly offensive
3 and I find this cover and both of them greatly
4 offensive.
5     Q. And I appreciate that, and you've repeated that
6 little speech several times. So I understand your --
7     A. Well, I don't -- I'm not so sure you do, so
8 I'll keep repeating it.
9     Q. No, I understand, but I do want to say to you I
10 wasn't meaning to insinuate in any way that your absence
11 from your daughter was to be equated with your father.
12 That wasn't my insinuation. I was just --
13     A. It came across that way.
14     Q. Well, I apologize if that was -- I was quoting
15 from your own interview.
16     A. A totally different thing.
17     Q. And -- but the question I just posed to you
18 that you didn't answer, and I need to have an answer to
19 it, is whether you're challenging any other statement in
20 either of these two articles as being false?
21     A. I'm challenging that -- listen, the days away
22 from my daughter, those are obviously accurate. In
23 terms of me abandoning my child, totally inaccurate.
24     Q. Okay. So you're not challenging any other
25 statement in the articles as being false beyond the

Page 209

1 abandonment?
2     A. Well, there is other statements and we'll go
3 through it, and I know that it's in the -- in the
4 Complaint.
5     Q. No, there is nothing else in the Complaint
6 about false statements, Mr. Cruise.
7     A. Okay. Good.
8     Q. So the only statements that are contended to be
9 false in the Complaint are --
10     A. Can I ask one --
11     Q. -- the abandonment.
12     A. Can I ask a question? Sorry. Am I allowed to
13 ask you a question?
14     Q. No, you're not allowed to ask your counsel a
15 question.
16     A. Oh, good. Okay. Good. This isn't like the
17 Godfather; right?
18     Q. Unfortunately, those are the rules. You
19 can't --
20     A. You know, good.
21     Q. I can show you the Complaint if you want and --
22     A. Yes, let me read the Complaint at this point.
23     Q. And there are no other statements -- here it
24 is.
25     A. Thank you.

53 (Pages 206 to 209)

Tom Cruise

| | | | |
|---|---|---|---|
| 1 | DECLARATION UNDER PENALTY OF PERJURY | 1 | STATE OF CALIFORNIA  ) |
| 2 | | | ) SS |
| 3 | | 2 | COUNTY OF LOS ANGELES  ) |
| 4 | I, Tom Cruise, hereby certify under penalty of | 3 | |
| 5 | perjury that I have read the foregoing transcript of my | 4 | I, Jean F. Holliday, a Certified Shorthand |
| 6 | deposition taken on September 9, 2013; that I have made | 5 | Reporter, do hereby certify: |
| 7 | such corrections as appear noted on the Deposition | 6 | That prior to being examined, the witness in the |
| 8 | Errata Page, attached herein, as corrected, is true and | 7 | foregoing proceedings was by me duly sworn to testify to |
| 9 | correct. | 8 | the truth, the whole truth, and nothing but the truth; |
| 10 | | 9 | That said proceedings were taken before me at the |
| 11 | Dated this _____ day of _____ 2013, at | 10 | time and place therein set forth, and were taken down by |
| 12 | _____, California. | 11 | me in shorthand and thereafter transcribed into |
| 13 | | 12 | typewriting under my direction and supervision; |
| 14 | | 13 | I further certify that I am neither counsel for, |
| 15 | | 14 | nor related to, any party to said proceedings, nor in |
| 16 | _____ | 15 | anywise interested in the outcome thereof. |
| 17 | Tom Cruise | 16 | In witness whereof, I have hereunto subscribed my |
| 18 | | 17 | name. |
| 19 | | 18 | |
| 20 | | 19 | Dated: September 19, 2013 |
| 21 | | 20 | |
| 22 | | 21 | _____ |
| 23 | | | Jean F. Holliday |
| 24 | | 22 | CSR No. 4535, RPR, CRR |
| 25 | | 23 | |
| | | 24 | |
| | | 25 | |
| | Page 242 | | Page 244 |

| | |
|---|---|
| 1 | DEPOSITION ERRATA SHEET |
| 2 | |
| 3 | Page No._____ Line No._____ |
| | Change:_____ |
| 4 | Reason for change:_____ |
| 5 | Page No._____ Line No._____ |
| 6 | Change:_____ |
| 7 | Reason for change:_____ |
| 8 | Page No._____ Line No._____ |
| 9 | Change:_____ |
| 10 | Reason for change:_____ |
| 11 | Page No._____ Line No._____ |
| 12 | Change:_____ |
| 13 | Reason for change:_____ |
| 14 | Page No._____ Line No._____ |
| 15 | Change:_____ |
| 16 | Reason for change:_____ |
| 17 | Page No._____ Line No._____ |
| 18 | Change:_____ |
| 19 | Reason for change:_____ |
| 20 | Page No._____ Line No._____ |
| 21 | Change:_____ |
| 22 | Reason for change:_____ |
| 23 | |
| 24 | |
| 25 | Tom Cruise          Dated |
| | Page 243 |

62 (Pages 242 to 244)

U.S. LEGAL SUPPORT
(800) 993-4464

EXHIBIT 26

109