UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TOM CRUISE,
           Plaintiff,

    vs.

BAUER PUBLISHING COMPANY, L.P.,
BAUER MAGAZINE L.P., BAUER MEDIA
GROUP, INC., BAUER, INC.,
HEINRICH BAUER NORTH AMERICA,
INC., and DOES 1-10,
inclusive,
           Defendants.

Case No. CV 12-09124 (DDP)(JCX)

\*\*\* CONFIDENTIAL - ATTORNEYS' EYES ONLY \*\*\*

VIDEOTAPED DEPOSITION OF TOM CRUISE

September 9, 2013

9:04 a.m.

1900 Avenue of the Stars, 21st Floor

Los Angeles, California

REPORTED BY:

Jean F. Holliday

CSR No. 4535, RPR, CRR

Page 1

Tom Cruise

| | |
|---|---|
| 1  APPEARANCES:<br>2<br>3    For the Plaintiff:<br>4      GREENBERG GLUSKER FIELDS CLAMAN MACHTINGER<br>       BERTRAM FIELDS<br>       1900 Avenue of the Stars, Suite 2100<br>5      Los Angeles, California 90067<br>       310.201.7454<br>6      310.553.0687 Fax<br>       bfields@greenbergglusker<br>7<br>       -AND-<br>8<br>       GREENBERG GLUSKER FIELDS CLAMAN MACHTINGER<br>9      AARON J. MOSS<br>       1900 Avenue of the Stars, Suite 2100<br>10     ~~Los Angeles, California 90067~~<br>       310.553.3610<br>11     310.201.2314 Fax<br>       amoss@greenbergglusker.com<br>12<br>   For the Defendants:<br>13<br>       DAVIS WRIGHT TREMAINE LLP<br>14     ELIZABETH A. McNAMARA<br>       1633 Broadway, 27th Floor<br>15     New York, New York 10019-6708<br>       212.489.8230<br>16     212.489.8340 Fax<br>       lizmcnamara@dwt.com<br>17<br>       -AND-<br>18<br>       DAVIS WRIGHT TREMAINE LLP<br>19     DEBORAH ADLER<br>       1633 Broadway, 27th Floor<br>20     New York, New York 10019-6708<br>       212.489.8230<br>21     212.489.8340 Fax<br>       deborahadler@dwt.com<br>22<br>   Also Present:<br>23<br>       GREGORY A. WELCH, GENERAL COUNSEL BAUER<br>24     PUBLISHING GROUP<br>       STAN BEVERLY, VIDEOGRAPHER<br>25<br>                                                    Page 2 | 1            INDEX TO CONFIDENTIAL EXHIBITS<br>2                          TOM CRUISE<br>3           Tom Cruise vs. Bauer Publishing Company<br>4                   Monday, September 9, 2013<br>5          Jean F. Holliday, CSR No. 4535, RPR, CRR<br>6<br>7   MARKED          DESCRIPTION                 PAGE<br>8   Exhibit 100   July 23, 2012 letter to Gregory     62<br>                Welch and Dan Wakeford, from<br>9               Aaron J. Moss; document titled<br>                "Society of Professional<br>10              Journalists Code of Ethics"; and<br>                a July 26, 2012 letter to Aaron<br>11              Moss from Gregory A. Welch<br>                (Bates Nos. TC000353 - 356)<br>12<br>    Exhibit 101   E-mail string dated August 8,      64<br>13              2011<br>                (Bates Nos. TC003350 and 3351)<br>14<br>    Exhibit 102   December 14th, 2012 letter to      70<br>15              Ms. McNamara from Mr. Fields,<br>                two pages<br>16<br>    Exhibit 103   Printouts from The Wrap website,   74<br>17              14 pages<br>18  Exhibit 104   E-mail string dated November 6,    80<br>                2012 and August 2, 2013, four<br>19              pages<br>20  Exhibit 105   Copy of a New York Post article    85<br>                titled "Tom Rips 'Nazi'<br>21              Diagnosis," dated June 12, 2008,<br>                one page<br>22<br>    Exhibit 106   Two-page printout from            100<br>23              www.scientology.org titled<br>                "Scientology. What Does<br>24              'Suppressive Person' Mean"?<br>25<br>                                                    Page 4 |
| 1            INDEX TO EXAMINATION<br>2          WITNESS: TOM CRUISE<br>3<br>4  EXAMINATION                       PAGE<br>5  By Ms. McNamara:                     7<br>6<br>7<br>8         INFORMATION REQUESTED<br>9            Page    Line<br>10            68      15<br>11<br>12        DOCUMENTS REQUESTED<br>13           Page    Line<br>14           (NONE)<br>15<br>16       WITNESS REFUSED TO ANSWER<br>17           Page    Line<br>18           108     25<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>                                    Page 3 | 1            INDEX TO EXHIBITS (Continued)<br>2   MARKED          DESCRIPTION                 PAGE<br>3   Exhibit 107   Copy of a cover of Vanity Fair    117<br>                magazine from 2006<br>4<br>    Exhibit 108   Chart showing schedules           131<br>5               (Bates Nos. TC002814 - 2833)<br>6   Exhibit 109   Document titled "Avjet             143<br>                Corporation Passenger Itinerary<br>7               1 January 2011 to 5 July 2012"<br>                (Bates Nos. TC002834 - 2836)<br>8<br>    Exhibit 110   Redacted phone bills              179<br>9               (Bates Nos. TC002795 - 2800,<br>                2791 - 2794, 2801, 2811 - 2813,<br>10              2790, 2808 - 2810, 2805 - 2807,<br>                2802 - 2804)<br>11<br>    Exhibit 111   E-mail string dated July 17,      197<br>12              2012<br>                (Bates No. TC003147)<br>13<br>    Exhibit 112   Series of e-mails                 200<br>14              (Bates Nos. TC000835, 836, 936,<br>                937 and 918)<br>15<br>    Exhibit 113   E-mail string dated September     203<br>16              15, 2012<br>                (Bates No. TC003140)<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>                                                    Page 5 |

2 (Pages 2 to 5)

U.S. LEGAL SUPPORT
(800) 993-4464

EXHIBIT 26

Tom Cruise

---

**Page 6**

                LOS ANGELES, CALIFORNIA;
        MONDAY, SEPTEMBER 9, 2013, 9:04 A.M.

                TOM CRUISE,
        having been first duly sworn, was
        examined and testified as follows:

                EXAMINATION

        THE VIDEOGRAPHER: Good morning. We're on the record. This is the video recorded deposition of Tom Cruise in the matter of Tom Cruise versus Bauer Publishing Company, et al., taken on behalf of the defendant. This deposition is taking place at 1900 Avenue of the Stars, Los Angeles, California, on September 9th, 2013, at approximately 9:04 a.m.
        My name is Stan Beverly. I'm the videographer with U.S. Legal Support located at 11845 West Olympic Boulevard, Los Angeles, California.
        Video and audio recording will be taking place unless all counsel have agreed to go off the record.
        Would all present please identify themselves beginning with the witness.
        THE WITNESS: Tom Cruise.
        MR. FIELDS: And I am Bert Fields, one of the

**Page 7**

lawyers for Mr. Cruise.
        MR. MOSS: Aaron Moss, also for Mr. Cruise.
        MS. McNAMARA: Elizabeth McNamara for the defendants, along with my colleague Deborah Adler.
        MR. WELCH: And Greg Welch also for the defendants.
        THE VIDEOGRAPHER: The certified court reporter is Jean Holliday.
        Would you please swear in the witness.

                TOM CRUISE,
        having been first duly sworn, was
        examined and testified as follows:

                EXAMINATION

BY MS. McNAMARA:
    Q. Good morning, Mr. Cruise.
    A. Good morning.
    Q. Thank you for coming. It's a standard question, so --
    A. Uh-huh, sure.
    Q. -- don't take offense, but I need to ask you to begin whether you're taking any medication or anything that would impede your ability to speak --

**Page 8**

    A. No.
    Q. -- honestly?
    A. No.
    Q. And truthfully?
    A. None.
    Q. Have you had your deposition taken before?
    A. Yes, I have.
    Q. And on how many occasions?
    A. I don't know. One, two, three, the one for Bob Towne in the writing thing. Maybe four, something like that.
    Q. Okay. In what actions were they?
    A. One was a lawsuit with Sephora, I think. I don't know. I don't.
        MR. FIELDS: I don't get to answer.
BY MS. McNAMARA:
    Q. Mr. Cruise, don't look --
    A. Oh, sorry. Sorry.
    Q. -- to your counsel to answer.
    A. You know what, I -- I honestly --
    Q. He's not here to testify.
    A. Sorry about that. You know, Bert can tell you. I don't really --
    Q. You don't remember any -- any action that you testified in?

**Page 9**

    A. No. There is a few that I testified in. There was one for SAG, for -- I guess for Bob Towne. There was a lawsuit that we had I think with Phillips years ago, and there was a recent case.
    Q. Involving Mr. Sapir?
    A. Yes. Yes, I think so.
    Q. And that testimony occurred last year; is that correct?
    A. We just did it recently, yes.
    Q. I want you to -- if for any reason you don't understand one of my questions, I want you to tell me that you don't understand it.
    A. Certainly.
    Q. If you don't do so, then we'll assume for the record that you did understand the question.
    A. Certainly.
    Q. Okay? Did you do anything to prepare for this deposition?
    A. Met with Bert and Aaron yesterday.
    Q. Okay. For how long?
    A. Probably talked about it for about an hour.
    Q. Okay. Did you look at any documents?
    A. Just reviewed the covers again of the magazines.
    Q. Did you review the articles?

3 (Pages 6 to 9)

Tom Cruise

Page 94

1   When I say "asserting a claim" I mean sending a
2   claim letter saying: You should retract this, you need
3   to -- you know, we're threatening to sue.
4       A. Uh-huh.
5       Q. It's short of lawsuit. Okay?
6       A. Yes.
7       Q. So with that understanding as -- as to
8   asserting a claim --
9       A. Yes.
10      Q. -- do you recall that your lawyers have
11  asserted claims concerning coverage about Suri prior
12  to --
13      A. Yes.
14      Q. -- the --
15      A. Yes.
16      Q. -- articles --
17      A. Yes. Thank you.
18      Q. -- at issue in this litigation?
19      A. Yes, I do. Yes.
20      Q. And one of them was about secret auditing of
21  Suri. Do you recall that?
22      A. I don't recall all of them, no.
23      Q. Or that you were creating a wedge between Katie
24  and Suri?
25      A. I don't recall all those.

Page 95

1       Q. Or that Suri was kept in a windowless room at
2   one of your homes?
3       A. I remember stuff when Suri was born, I do. I
4   don't know if it was specifically that, but I do recall
5   some of those kinds of statements.
6       Q. Before a claim letter is sent do you approve
7   the claim letter?
8       A. No, not all of them.
9       Q. Do you read the applicable articles that are
10  being challenged?
11      A. I get briefed on them or I read them, yes.
12      Q. And again, I think you testified to this, and I
13  apologize if I'm asking you to repeat it, but when you
14  say you get briefed on it, that's by Amanda Lundberg?
15      A. By Amanda or if it's a legal thing I'll call
16  Bert, discuss it with my counsel.
17      Q. Okay. Now, there came a time, Mr. Cruise, that
18  you and your wife separated; is that right, Katie
19  Holmes?
20      A. Where she filed divorce.
21      Q. Yes. And that was at the end of June 2012?
22      A. Yes.
23      Q. And since the divorce -- or rather since prior
24  to that time, from June 18th of 2012 until Thanksgiving
25  of 2012, you only saw Suri a few times; isn't that

Page 96

1   right?
2       A. Yes.
3       Q. I think your counsel have produced documents in
4   this litigation that includes your schedule and
5   travel --
6       A. Yes.
7       Q. -- and the like. And according to those
8   records you, during that period of time of June 18th
9   until Thanksgiving of 2012, you saw your daughter for 10
10  days.
11      A. I don't know the total number of days.
12      Q. Does that sound right?
13      A. I don't know. I'd have to look at it.
14      Q. They were the three days of July 17th to the
15  19th, when you came into New York, and then you went out
16  to the Hamptons. Do you recall that?
17      A. Yes, I do.
18      Q. Okay. You saw her for 12 hours on July 26, or
19  approximately thereof. Do you recall that? You were
20  flying from London to L.A. and you stopped in New York
21  for --
22      A. Yes.
23      Q. -- about 12 hours?
24      A. Yes.
25      Q. And then there were the six days,

Page 97

1   approximately, when you came to New York and picked up
2   Suri and you took her to Disney World?
3       A. Uh-huh.
4       Q. Do you recall that?
5       A. Yes, I do.
6       Q. So if you add those up, those are generously 10
7   days.
8       A. Okay.
9       Q. Do you have any reason to dispute that
10  calculation?
11      A. None.
12      Q. Prior to your divorce with Ms. Holmes was
13  Ms. Holmes close with your other children, Connor and
14  Isabella?
15      A. Yes.
16      Q. And was she close with your sisters?
17      A. Fairly, yes.
18      Q. One or more of your sisters lived in the home;
19  is that right?
20      A. At one point Cass did when we were living on
21  Alpine.
22      Q. Okay. But the other sisters don't -- you have
23  three -- is it correct you have three sisters?
24      A. Three sisters.
25      Q. Do they all live in Los Angeles?

25 (Pages 94 to 97)

U.S. LEGAL SUPPORT
(800) 993-4464

EXHIBIT 26

100

Tom Cruise

```
 1      Q. And do you use the same security detail, or do
 2   you change from location to location?
 3      A. You know, that's -- I really don't know. I
 4   don't run -- I'm not overseeing all the security.
 5   Depends on the studio, who they want.
 6      Q. So the studio supplies the security, in your
 7   experience?
 8      A. Yeah, in different -- in different times, like
 9   I guess when I'm on a -- on a movie I think the
10   economics of it are that the studio pays the security
11   for that.
12      Q. And do you know whether they keep records as to
13   your whereabouts?
14      A. I don't know.
15      Q. Have you ever seen records documenting your
16   whereabouts on any particular day from security?
17      A. No. I never asked.
18      Q. In connection with this litigation do you know
19   whether there was any attempt to obtain logs of
20   security, security logs regarding your whereabouts
21   during any particular period of time?
22      A. No.
23      Q. No, there was no such attempt?
24      A. No, I don't know if there was such attempt.
25      Q. If you look at the schedule, or this document
                                                  Page 134
```

```
 1   that's been marked Exhibit 108, on the pages that have
 2   Bates stamps that are 2814 to 2815, the first two pages.
 3      A. 28 -- oh, I see that at the bottom, 2814 to
 4   what, please?
 5      Q. The next page, 2815.
 6      A. Uh-huh.
 7      Q. During much of this period of time you were
 8   shooting MIGP?
 9      A. Uh-huh.
10      Q. Can you say what MIGP is?
11      A. Mission: Impossible - Ghost Protocol.
12      Q. And much of that shooting was occurring in
13   Vancouver; is that right?
14      A. At this time period, yes, I guess.
15      Q. And if you look at this record it documents
16   that Ms. Holmes and Suri were often on location.
17      A. Yes.
18      Q. Is that right?
19      A. Yes.
20      Q. And was that a common practice during that
21   period of time, 2011, that Ms. Holmes and Suri would be
22   on location with you?
23      A. I mean they were in and out, absolutely.
24      Q. I mean from our review of this schedule it
25   appears that from January to May -- January 2011 to May
                                                  Page 135
```

```
 1   2012 there were only a few instances when you were away
 2   from Suri for more than a week. Does that ring true to
 3   you?
 4      A. If it -- it doesn't ring untrue to me.
 5      Q. Okay. And is that consistent with your memory?
 6      A. Yes.
 7      Q. And I assume, as would be indicated from that,
 8   that it was important for you to see Suri, wasn't it?
 9      A. Yes.
10      Q. And you believed it was important for her as
11   well?
12      A. Yes.
13      Q. And I assume when you were away from her she
14   missed you?
15      A. Yes.
16      Q. Did -- during -- during those times when you
17   were away from her, did Ms. Holmes ever indicate to you
18   that Suri was upset or that she missed you, do you
19   recall?
20      A. No.
21      Q. But you would agree with me, I assume, that
22   it's important to physically be with a child when you
23   can; isn't that right?
24      A. I do.
25      Q. And especially a child that's young, like four
                                                  Page 136
```

```
 1   or five, six years old, they can't communicate by e-mail
 2   with you, can they?
 3      A. No.
 4      Q. And they can't text you, can they?
 5      A. No.
 6      Q. And so if you're not there, the only means of
 7   communication is telephone; isn't that right?
 8      A. Yes, it is.
 9      Q. And telephone is to some degree a poor
10   substitute for physically being there, isn't it?
11      A. No question.
12      Q. I mean I remember my daughter when she was that
13   age, she wasn't much of a conversationist when I got on
14   the phone.
15      A. You have to work at it. I've gotten very good
16   at it. I've gotten very good at it. I tell wonderful
17   stories and they like hearing it.
18      Q. Well, that's nice.
19      A. Yes.
20      Q. But you don't often -- it really doesn't
21   substitute for being able to hug them, does it?
22      A. No, it doesn't.
23      Q. And in my experience when you talk to a young
24   child like that on the phone they often get distracted.
25      A. Yeah, they do, but as I said, I've gotten
                                                  Page 137
```

35 (Pages 134 to 137)

**U.S. LEGAL SUPPORT**
**(800) 993-4464**

EXHIBIT 26

101

Tom Cruise

Page 138

```
 1  pretty good at communicating, and I also find that, you
 2  know, Suri, you know, is a very happy child, and
 3  confident and has a good sense of herself.
 4      Q. And there were times in this period, according
 5  to this schedule, when Ms. Holmes was traveling and Suri
 6  was alone with you. Is that accurate?
 7      A. Yes.
 8      Q. And now direct your attention to Page 2821 of
 9  this schedule. On this page for much of the time it
10  indicates your schedule is that you're filming OS?
11      A. Uh-huh, One Shot.
12      Q. That was going to be my question.
13      A. Yes.
14      Q. The movie was One Shot?
15      A. Yes. We changed the title to Reacher.
16      Q. To what?
17      A. To Reacher.
18      Q. Yeah, I was going to say, I don't remember One
19  Shot coming out.
20      A. No.
21      Q. I don't think they'd throw away one of your
22  films.
23      A. No. No.
24      Q. They spent a lot -- too much money on it.
25      A. They should, they should throw away a few of
```

Page 139

```
 1  them, but I don't feel that way.
 2      Q. If you -- if you direct your attention to a
 3  little after the middle of the page, the Saturday,
 4  October 15th, do you see that, Mr. Cruise?
 5      A. Yes.
 6      Q. It indicates that -- that you were filming on
 7  Friday in Pittsburgh, Pennsylvania, and then you flew to
 8  London.
 9      A. Yes.
10      Q. Do you see that?
11      A. Yes.
12      Q. And then the next day, on October 15th, you
13  were in London?
14      A. Yes.
15      Q. And it says you were at an IAS event.
16      A. Uh-huh.
17      Q. What is that?
18      A. That's an International Association of
19  Scientology. It's an international event that we have
20  for our Church.
21      Q. And were you speaking at that event?
22      A. No, I was not.
23      Q. So you were just attending?
24      A. Yes.
25      Q. And then according to this schedule you
```

Page 140

```
 1  returned to Pittsburgh on Sunday, October 16th, and
 2  returned to filming?
 3      A. Yes.
 4      Q. Do you see that?
 5      A. Yes, I do.
 6      Q. Do you know whether they had to shut down
 7  filming of One Shot because you flew out on Friday then
 8  returned on Sunday?
 9      A. No, they did not.
10      Q. And you believed it was important that you
11  attended that event, didn't you?
12      A. Yes.
13      Q. Why was it important to you?
14      A. It was an important event. I felt it was
15  important.
16      Q. It's an annual event?
17      A. Yes, it is.
18      Q. Is it more than once -- do they have such
19  events more than once a year?
20      A. That is an international annual event, yes.
21      Q. But based upon this, you could fly from the
22  East Coast to London for 24 hours; is that right?
23      A. In that situation, yes.
24      Q. And you did that for the Church event --
25      A. Yes.
```

Page 141

```
 1      Q. -- did you not? But you didn't do it for Suri;
 2  isn't that right?
 3      A. When did I not do it for Suri?
 4      Q. In July, August, September, October.
 5      A. That's not true.
 6      Q. You didn't --
 7      A. In July I did fly to see my daughter.
 8      Q. I know, but I'm talking about from -- let's
 9  take -- let's take the dates from August 8th until
10  Thanksgiving.
11      A. Different situation.
12      Q. There was no 24-hour -- there were no 24-hour
13  period of time there that you couldn't have flown to see
14  Suri?
15      A. Listen, when there is a divorce -- if you look
16  at this also in terms of Suri coming to me and certain
17  agreements that you have, when a divorce occurs things
18  change. And it's more complicated, as everyone knows
19  when that is, when that occurs, and there are certain
20  agreements; now you have to ask for permission and
21  organize schedules to make things happen. So it
22  wasn't -- it's not an ideal scene. It's not an ideal
23  situation.
24      Q. And you were in part responsible for that
25  absence, weren't you?
```

36 (Pages 138 to 141)

U.S. LEGAL SUPPORT
(800) 993-4464

EXHIBIT 26

102

### Page 142

1  A. No.
2  Q. In no way?
3  A. No.
4  Q. You couldn't have -- you were unable to fly for
5  24 hours from London to New York?
6  A. Yes.
7  Q. And why were you unable, Mr. Cruise?
8  A. There are many different circumstances. One,
9  first of all, at this point when you're looking at --
10 you can't compare Reacher to All You Need Is Kill or
11 Edge of Tomorrow. And the situation, you know, when
12 you're thinking of your child and thinking what is the
13 best thing for them, and of course respecting Kate's
14 wishes in terms of Suri's scheduling, the nature of
15 making that film, the nature of having finished one film
16 and kind of -- agreements change, you know. That wasn't
17 how the thing was set up. As I said, things change.
18 Things change. And certainly what doesn't change is the
19 love that I have for my daughter, the fact that I didn't
20 abandon her emotionally, physically or otherwise. And
21 in terms of how I feel about her in terms of the
22 responsibility that I feel towards my child is not -- is
23 not waned in any way.
24 Q. Okay. We'll -- we'll get into a little more
25 about that time period.

### Page 143

1  A. Sure, please.
2  Q. And what you're -- what you were capable of
3  doing.
4  A. Thank you.
5     MS. McNAMARA: Okay. Let me mark a document
6  that was provided to us in this litigation, it's called
7  a Passenger Itinerary. And we'll have that be 109.
8  It's Bates stamped TC 2834 through TC 2836.
9     (Exhibit 109 marked)
10 BY MS. McNAMARA:
11 Q. Have you seen this document before, Mr. Cruise?
12 A. No, I have not.
13 Q. Do you know how it was obtained --
14 A. No, I do not.
15 Q. -- or who created it?
16    Have you heard of the corporation called Avjet?
17 A. Yes.
18 Q. What's that?
19 A. That's a company that handles the -- my
20 airplane.
21 Q. And when you say "my airplane," do you own an
22 airplane?
23 A. Yeah, other airplanes. Yes, I do.
24 Q. And when you --
25 A. I own it through a corporation.

### Page 144

1  Q. Okay. And when you fly on Avjet you're flying
2  your plane?
3  A. Most of the time, yes. If my plane isn't
4  available I'll use Avjet or the studio will use it for
5  other airplanes.
6  Q. Okay. And who books your flights, do you know?
7  A. What do you mean by that?
8  Q. Well, who calls up and arranges that you want
9  to fly on X date and go to location Y, do you do that
10 personally or does Cass or --
11 A. Cass, I think Cass does that.
12 Q. And do you -- is it fair to say that you pretty
13 much consistently fly your own plane or private planes?
14 A. Yes.
15 Q. Do you ever fly commercial?
16 A. I flew commercial from Dubai.
17 Q. To where?
18 A. To Los Angeles.
19 Q. Is that the only time it occurs to you in the
20 last three or four years?
21 A. Yes.
22 Q. Do you agree that it's faster to fly a private
23 jet versus commercial?
24 A. Well, generally it's easier, yes.
25 Q. It's -- I mean you don't have to like us plebes

### Page 145

1  who have to stand in security lines.
2  A. You got to go through security, it does save --
3  it does save time. Sometimes the flight itself is
4  longer if you have, you know -- but yeah, it's better.
5  It's much more comfortable.
6  Q. Looking at what's been marked as Exhibit 109,
7  do you have any reason to doubt the accuracy of this
8  document?
9  A. I have no reason to believe it's inaccurate.
10 Q. Okay. The flight I was referring to earlier
11 appears on the first page when you flew from Pittsburgh,
12 PA, to London and then -- on the 14th of October and
13 then on the 16th of October you flew back from London to
14 Pittsburgh. Do you see that?
15 A. I do now, yes.
16 Q. Do you -- do you have a sense, having flown a
17 fair amount from the East Coast to London, how many
18 hours it takes you to do that?
19 A. I mean it depends on headwinds, I guess. I
20 don't know. Eight, nine, ten, 11 hours.
21 Q. You fly planes yourself, don't you?
22 A. Yes. I'm a pilot.
23 Q. Do you own smaller planes that you fly, or do
24 you fly your personal jet that you keep at --
25 A. No. I fly smaller airplanes, war birds and

37 (Pages 142 to 145)

Page 146

```
1   aerobatics.
2       Q. Now, as indicated on Exhibit 109 on Page 28 --
3   28? Let me see. Or is this the -- sorry. I'm back on
4   Exhibit 108. If you turn to the page that has the Bates
5   stamp 2828, which is pretty far into the document.
6   About June 8th is --
7       A. Yes.
8       Q. -- shortly down the document. It indicates
9   that you flew from L.A. overnight to the UK, spent
10  Saturday, June 9th, in London for the Rock of Ages
11  premiere.
12      A. Yes.
13      Q. And then on Sunday, June 10th, you flew from
14  London to New York City to meet Suri.
15      A. Yes.
16      Q. Do you recall that?
17      A. Yes.
18      Q. And again, to your knowledge did the flight
19  from London to New York, did that take about seven
20  hours?
21      A. I don't know how long the flight was
22  specifically.
23      Q. It would be within that range, wouldn't it,
24  generally?
25      A. I'm not sure. Depends on winds. Could be
```

Page 147

```
1   eight, nine hours, whenever.
2       Q. Did you consider at the time attending the UK
3   premiere to be important?
4       A. It's an obligation.
5       Q. And during this period of time you were filming
6   Oblivion; is that right?
7       A. Yes.
8       Q. Do you know with taking that 36-hour trip, or
9   48-hour trip, did they shut down Oblivion, filming of
10  Oblivion for that trip?
11      A. I'm not sure. I don't know what happened. I'd
12  have to refer to it.
13      Q. Do you have any reason or recollection that
14  they did shut down filming in order for you to go to UK?
15      A. I know the studios work out, negotiate time for
16  me to fulfill the obligations.
17      Q. Okay.
18      A. So I don't know if they shut down or what
19  happened at that point. I'd have to refer --
20      Q. I mean it's really --
21      A. -- back and think about it.
22      Q. I'm sorry.
23      A. No. I'd have to refer back and think about it.
24      Q. Okay. So but it's -- it's possible in your
25  experience for them to continue on doing other things on
```

Page 148

```
1   the film if you're gone; isn't that right?
2       A. It's organized ahead of time, yeah.
3           Listen, there is -- I know a lot of people feel
4   that -- and I get questions, you know, isn't memorizing
5   the hardest thing about making movies?
6       Q. Uh-huh.
7       A. And particularly someone in my case and having
8   produced films, the responsibility that I have, even if
9   I'm not producing, because I've produced so many films,
10  me starting a film with a studio is -- they are
11  expecting the full body of knowledge and, you know, they
12  are expecting all of that. So there is much more that
13  goes into a film instead of just a day of shooting or a
14  day of filming. Even if I'm not there physically, there
15  is a level of responsibility that I have for the
16  schedule, for the budget, for the preparation, for the
17  storytelling, the structure, for the kind of guidance
18  and support of every department.
19          And each film has different kinds of demands,
20  both physically and mentally, and whereas a One Shot is
21  much different than a Rock of Ages, there is different
22  physical requirements. There is different physical kind
23  of stamina and preparation. Sometimes I've spent
24  months, a year, sometimes two years preparing for a
25  single film, and each one is different. And during this
```

Page 149

```
1   time period, you know, particularly when I'm going into,
2   you know, the films that were lined up from Reacher,
3   from -- I guess it was Mission: Impossible, Rock of
4   Ages, Reacher, Oblivion, and then into All You Need Is
5   Kill, that eventually is to be called Edge of Tomorrow,
6   that, you know, it's -- like even now, I mean we talked
7   about lunch, I have to watch specifically what I eat for
8   inflammation and different things that you have to do
9   physically to prepare for a film, and that's for some
10  people, you know, it's -- I train, you know, I've
11  studied, you know, professional athletes, Olympians in
12  order to, you know -- a sprinter for the Olympics, they
13  only have to run two races a day. When I'm shooting I
14  could potentially have to run 30, 40 races a day, day
15  after day.
16          So each film has a different kind of demand
17  with schedule. So even if I'm not shooting on those
18  days, there is communication with those things and
19  responsibility towards that particular project.
20      Q. And as I understand your last answer, which I
21  appreciate, you take all that very seriously, don't you?
22      A. I'm responsible not only for myself but for my
23  crew, the studio, it kind of spreads out to thousands
24  and thousands of people.
25      Q. Sure. And those responsibilities as you've
```

38 (Pages 146 to 149)

U.S. LEGAL SUPPORT
(800) 993-4464

EXHIBIT 26

104

|   | Page 162 |
|---|---|
| 1 | Q. Okay. And in order to make that happen you |
| 2 | adjusted your schedule so that you stopped over in |
| 3 | Newark; isn't that right? Because that was an important |
| 4 | event, wasn't it? |
| 5 | A. Yes, I did. |
| 6 | Q. Okay. Now -- do you want to take a break? |
| 7 | A. No. I'm fine. |
| 8 | Q. You're sure? |
| 9 | A. Yeah. |
| 10 | Q. I'm happy to. |
| 11 | A. No. I'm good. |
| 12 | Q. Okay. Now, moving to August of 2012 those -- |
| 13 | we've touched on previously that you had about six days |
| 14 | when you took Suri to Disney World. |
| 15 | A. Yes. |
| 16 | Q. And you dropped her off, according to this |
| 17 | schedule, on Saturday, August 4th; is that right? |
| 18 | A. I don't know the exact dates of that. If the |
| 19 | schedule says it, I don't have any disagreement with it. |
| 20 | Q. Okay. And then from August 4th until August |
| 21 | 20th you were not filming; is that right? |
| 22 | A. I was not filming, I guess not, no. |
| 23 | Q. And you were spending that time in Los Angeles. |
| 24 | You stayed in Los Angeles until August 20th, according |
| 25 | to this schedule. |

Page 163
1  A. I don't have a disagreement with that.
2  Q. Okay. When you flew from Burbank to London on
3  the 20th, or the 19th, I'm not sure which day you
4  flew -- you flew from -- you flew on August 20th,
5  according to your Avjet. Is there a reason you didn't
6  stop over in New York to see Suri again?
7  A. As I said, things change and there is different
8  agreements, like in any divorce, where now you work out
9  schedules. It's just a different set of circumstances.
10 It certainly does not mean that I've abandoned my
11 daughter.
12 Q. That wasn't my question, Mr. Cruise.
13 A. I understand, but --
14 Q. My question was, it was a decision you made,
15 did you not?
16 A. No, not necessarily.
17 Q. Did you ask --
18 A. I'd have to recall.
19 Q. -- to stop over at that time?
20 A. There is certain agreements that we have in
21 visitation.
22 Q. What are the agreements that you have about
23 visitation?
24 A. I'll have to go through it.
25 Q. Did the agreements prevent you from seeing your

Page 164
1  daughter for over 100 days?
2  A. Over 100 days?
3  Q. Uh-huh. From August 4th until Thanksgiving you
4  did not see your daughter.
5  A. No, I understand that.
6  Q. If you count those days, it's over 100 days.
7  A. Yes.
8  Q. Does your agreement with Ms. Holmes regarding
9  visitation, would it have prevented you from seeing your
10 daughter during that period of time?
11 A. I would have had to have at specific times
12 flown from London to New York.
13 Q. Okay. And that was something that was
14 impossible to do?
15 A. Unfortunately, in this situation it was
16 impossible.
17 Q. Now, when you got to -- according to this
18 schedule, when you got to London on August 20th -- and
19 again, I suspect you're not going to be able to answer
20 this question, so it might be a question that your
21 counsel will have to answer since we were not provided
22 with any backup concerning this document, but for the
23 next -- if you look at that Page 2830, it now just says
24 AYNIK for your schedule for every day.
25 A. All You Need Is Kill, yes.

Page 165
1  Q. Whereas prior pages would differentiate what
2  you were doing, you were shooting, you were wrap, you
3  were in preparation, you were doing voice lessons, you
4  were doing -- they were very specific about what you
5  were doing, and when it gets to All You Need Is Kill for
6  the pages of Exhibit 108, 2830 through 28 -- top of
7  2833, it doesn't provide us with any detail as to what
8  you were doing on All You Need is Kill. Do you know why
9  that is?
10 A. I don't know why that is. I don't know why.
11 Q. Would there be documentation, scheduling, call
12 sheets, whatever, that would be able to substantiate
13 what you were doing on those days?
14 A. I don't know.
15 Q. Kind of knowing how your schedule works, do you
16 get like an e-mail in the morning about okay, this is
17 the call sheet for today, or are you physically sent
18 something? How do you get it?
19 A. Sometimes it's verbal as we're going through
20 it. Just day to day, I can tell you day to day it was a
21 significant amount of work. All You Need Is Kill is an
22 incredibly grueling and ambitious film. The nature of
23 the movie, it's an epic picture, and when you look at
24 the nature of the photos of what we were attempting to
25 do with practical in-camera action, it just so happened

**Tom Cruise**

Page 170

```
 1  evenings in London when you were there; isn't that
 2  right?
 3      A. A few number of evenings.
 4      Q. You went to birthday parties?
 5      A. I don't recall going to --
 6      Q. Or a birthday party?
 7      A. I don't recall going to a birthday party.
 8      Q. Cameron Diaz's party?
 9      A. I didn't go to Cameron Diaz's birthday party.
10      Q. You didn't?
11      A. You've been reading the press. You can't
12  believe everything you read.
13      Q. Well, sometimes photographs tell a story.
14      A. You can't believe everything you read though.
15  Photographs do not tell a story. They are
16  reinterpreted, as we can see from the cover of this
17  magazine.
18      Q. Well, actually I think on that particular thing
19  then your lawyers, who were acting as your PR agent at
20  that time, confirmed it, or your PR agent did, that you
21  were with Cameron Diaz for her birthday.
22      A. I did not go to Cameron Diaz's birthday party.
23      Q. Okay. In August, I believe, you learned that
24  Suri was going to go to Avenues, the school; is that
25  right?
```

Page 171

```
 1      A. No. Before that Kate had discussed it with me.
 2      Q. And do you recall when you learned when she was
 3  going to have her first day of school?
 4      A. I don't recall the first moment that I heard.
 5      Q. Do you have any recollection having any
 6  discussion about Suri's first day of school?
 7      A. Yes. Kate and I both knew that I wouldn't be
 8  able to be there.
 9      Q. And do you recall any discussion with her about
10  whether -- whether she wanted you to be there, whether
11  Suri wanted you to be there?
12      A. Suri never mentioned it.
13      Q. She never mentioned that she wanted her daddy
14  to be there --
15      A. No.
16      Q. -- for her first day of school?
17      A. No, she didn't.
18      Q. She hadn't been to school before, had she?
19      A. No.
20      Q. So this was truly her first day of school?
21      A. Yes.
22      Q. Unlike most of the other kids who were starting
23  who were first graders and had been to kindergarten and
24  preschool?
25      A. Yes.
```

Page 172

```
 1      Q. So that would be a big day for a little girl,
 2  isn't it?
 3      A. I think parents sometimes think it's, you
 4  know -- with Suri, if she had asked me to be there I
 5  would have been there. I would have tried to make it
 6  work out in any way that I could.
 7      Q. I see. So because she didn't ask you, you
 8  weren't there?
 9      A. Well, it's also something where -- I think the
10  press and everyone -- there are many different
11  circumstances with that. One is the circus of Suri's
12  first day of school that the press wanted, and Kate and
13  I discussing kind of what is best and how do we do it,
14  and of course there is a lot of media attention. As I
15  said, everything -- look, we do the best we can to try
16  to think about things and mitigate that stuff as best we
17  can.
18      Q. And did you at that time promise Suri that you
19  were going to be there for the first day of school?
20      A. No. No. Everything with my kids if I promise
21  them I'm going to do something I do it.
22      Q. Would you agree that children experience time
23  differently than adults?
24      A. No. I don't know.
25      Q. I mean do you have any sense as to whether like
```

Page 173

```
 1  three months for a six-year-old feels like, in a
 2  six-year-old's world, is an eternity?
 3      A. I don't know that to be true.
 4      Q. You don't?
 5      A. No.
 6      Q. Would you agree that many people believe that?
 7      A. No.
 8      Q. Now, there came a time when Katie suggested to
 9  you that you come to New York to see Suri in October;
10  isn't that right?
11      A. Yes.
12      Q. And you didn't do it, did you?
13      A. I couldn't do it.
14      Q. Now, your counsel has publicly equated your
15  absence from Suri for these extended periods of time as
16  being analogous to someone fighting in Afghanistan. Are
17  you aware of that?
18         MR. FIELDS: Object to the form of the
19  question.
20         You may answer.
21  BY MS. McNAMARA:
22      Q. Yeah, you can answer.
23      A. I didn't hear the Afghanistan, but that's what
24  it feels like, and certainly on this last movie, it was
25  brutal. It was brutal.
```

44 (Pages 170 to 173)

**U.S. LEGAL SUPPORT**
**(800) 993-4464**

EXHIBIT 26

106

**Page 194**

1 Q. physically absent from your daughter for significant
2 periods of time?
3 A. No.
4 Q. You've never seen any other reports by other
5 publications that you hadn't seen your daughter for --
6 A. I haven't seen them.
7 Q. -- a significant period of time?
8 A. I haven't read them.
9 Q. As you sit here today do you have any reason to
10 believe that that's not the case?
11 A. I beg your pardon?
12 Q. As you sit here today do you have any reason to
13 believe that other publications did not report that you
14 were absent from your daughter for significant periods
15 of time?
16 A. I don't have reason to believe they did or they
17 didn't. I know they haven't -- none of them said that I
18 abandoned my child.
19 Q. Now, are you aware that the week before the
20 first issue that you've challenged in this litigation
21 that Life & Style reported that you were physically
22 absent from Suri?
23 A. No.
24 Q. And that as a result of your absence she was
25 upset and crying a lot?

**Page 195**

1 A. No.
2 Q. Do you know whether anyone issued a complaint
3 to Life & Style about that report?
4 A. I don't know.
5 Q. Do you know whether that report was false?
6 A. Oh, it's absolutely false.
7 Q. Well, it's not false that you were absent.
8 A. No. That my daughter was upset, that's false.
9 Q. Okay. Did your counsel seek a retraction for
10 that publication?
11 A. I don't know.
12 Q. Are you aware that the Mail Online published a
13 headline saying, "Suri and Tom finally," with finally
14 all in caps, "reunite after more than three months
15 apart"? This is on -- in November 22, 2012.
16 A. No.
17 Q. Did you assert a claim based upon that
18 headline?
19 A. Not to my knowledge.
20 Q. Do you know whether you asked for a retraction?
21 A. Not to my knowledge.
22 Q. And it was accurate, wasn't it, that you had
23 been more than three months?
24 A. Yes.
25 Q. Now, in the Playboy interview that I referenced

**Page 196**

1 earlier that came out in June of 2012, right shortly
2 before the divorce, do you recall there that you
3 indicated that your father was mostly absent because he
4 was working?
5 A. I don't recall what I said exactly.
6 Q. Is that true?
7 A. My father worked, he worked, and that my
8 parents were divorced and that I didn't see him.
9 Q. Do you see any similarity?
10 A. Absolutely none. My father didn't pay money.
11 He didn't call.
12 Q. Okay. Do you know whether on July 16th, the
13 day before you came to New York to see Suri for the
14 first time in a month, do you know whether your
15 publicist knew you were coming?
16 A. I'm not sure if she did or not. I might have
17 told her.
18 Q. But as you sit here today you don't know
19 whether you told your publicist that you were coming the
20 next day?
21 A. I don't recall whether I did or I didn't.
22 Q. Do you have any information as to whether she
23 told anybody at Life & Style that you were in fact
24 coming the next day to meet your daughter?
25 A. I have no information on that.

**Page 197**

1 Q. And so you have no reason to believe that she
2 told them that?
3 A. I have no reason to believe that she told or
4 didn't tell. I don't remember. I don't know.
5 Q. Now, when -- when asked about -- let me show
6 you a document that -- no, tab 43. Can we have this
7 marked as Exhibit 111. It's a one-page document Bates
8 stamped TC 3147.
9 (Exhibit 111 marked)
10 BY MS. McNAMARA:
11 Q. This indicates that -- I can show you another
12 document but a representative at Life & Style had
13 reached out to Amanda to make inquiries about their
14 article, including the fact that you hadn't seen Suri
15 for four weeks, and Amanda indicates here, instead of
16 telling them that you in fact were coming the next day,
17 she indicates "I didn't answer Heidi." Do you see that?
18 And she indicates that "They are idiots and morons." Do
19 you see that as well?
20 A. Yes.
21 Q. Did you have an understanding that that's -- I
22 can represent to you is consistent with the tone adopted
23 by Amanda Lundberg often in e-mails with the media?
24 MR. FIELDS: Objection to form of the question.
25 You may answer.

**Page 206**

1  Particularly at this time I was very, very busy.
2      MS. McNAMARA: Okay. We call for the
3  production of correspondence during this period of time
4  between Mr. Fields and any representatives of Ms. Holmes
5  concerning press contact, and I won't limit that request
6  to Mr. Fields. If there was another representative of
7  the law firm who sent the letter I would seek that
8  correspondence as well.
9      Q. Do you know why -- do you know why Ms. Lundberg
10 would tell emphatically to Bauer that you don't own a
11 plane?
12     MR. FIELDS: Object to the form of the
13 question.
14 BY MS. McNAMARA:
15     Q. Do you know why she would say that?
16     A. No.
17     Q. It's false, isn't it?
18     A. Yes. Maybe she didn't know I owned it. I
19 don't know.
20     Q. Okay. But she didn't ask you, did she?
21     MR. FIELDS: Object to the form of the
22 question.
23     You may answer.
24     THE WITNESS: I don't recall being asked if I
25 owned it or not.

**Page 207**

1  BY MS. McNAMARA:
2      Q. Now, as I understand this action, but I just --
3  part of my job here is to make sure I understand your
4  Complaint, and what you're complaining about in this
5  action is the use of the word "abandoned" on the covers;
6  is that correct?
7      A. Saying that I abandoned Suri.
8      Q. Okay.
9      A. I abandoned my daughter.
10     Q. Okay. And you're not complaining about
11 anything else that's contained in the articles, are you?
12     A. I really -- look, I don't like the articles. I
13 don't like the fact that it's the cover of these stories
14 and what it says on the cover of these stories. And I
15 know that a lot of people walk past and see that and
16 it's something that is going to be there forever, and I
17 find it absolutely disgusting. And I had asked for a
18 retraction and they wouldn't give it to me. It is
19 something that will be there, unfortunately, forever.
20     And I understand, listen, I am someone who is
21 in the public eye. I am used to a tremendous amount of,
22 you know, misrepresentations, but when it comes to
23 something like that, I find it appalling. Even the fact
24 that you would suggest that I was being like my father,
25 it's the same thing that my father did, and suggesting

**Page 208**

1  that that's something that I'm doing in terms of
2  abandoning my children, I find that greatly offensive
3  and I find this cover and both of them greatly
4  offensive.
5      Q. And I appreciate that, and you've repeated that
6  little speech several times. So I understand your --
7      A. Well, I don't -- I'm not so sure you do, so
8  I'll keep repeating it.
9      Q. No, I understand, but I do want to say to you I
10 wasn't meaning to insinuate in any way that your absence
11 from your daughter was to be equated with your father.
12 That wasn't my insinuation. I was just --
13     A. It came across that way.
14     Q. Well, I apologize if that was -- I was quoting
15 from your own interview.
16     A. A totally different thing.
17     Q. And -- but the question I just posed to you
18 that you didn't answer, and I need to have an answer to
19 it, is whether you're challenging any other statement in
20 either of these two articles as being false?
21     A. I'm challenging that -- listen, the days away
22 from my daughter, those are obviously accurate. In
23 terms of me abandoning my child, totally inaccurate.
24     Q. Okay. So you're not challenging any other
25 statement in the articles as being false beyond the

**Page 209**

1  abandonment?
2      A. Well, there is other statements and we'll go
3  through it, and I know that it's in the -- in the
4  Complaint.
5      Q. No, there is nothing else in the Complaint
6  about false statements, Mr. Cruise.
7      A. Okay. Good.
8      Q. So the only statements that are contended to be
9  false in the Complaint are --
10     A. Can I ask one --
11     Q. -- the abandonment.
12     A. Can I ask a question? Sorry. Am I allowed to
13 ask you a question?
14     Q. No, you're not allowed to ask your counsel a
15 question.
16     A. Oh, good. Okay. Good. This isn't like the
17 Godfather; right?
18     Q. Unfortunately, those are the rules. You
19 can't --
20     A. You know, good.
21     Q. I can show you the Complaint if you want and --
22     A. Yes, let me read the Complaint at this point.
23     Q. And there are no other statements -- here it
24 is.
25     A. Thank you.

## Tom Cruise

| | | | |
|---|---|---|---|
| 1 | DECLARATION UNDER PENALTY OF PERJURY | 1 | STATE OF CALIFORNIA  ) |
| 2 | | | ) SS |
| 3 | | 2 | COUNTY OF LOS ANGELES ) |
| 4 | I, Tom Cruise, hereby certify under penalty of | 3 | |
| 5 | perjury that I have read the foregoing transcript of my | 4 | I, Jean F. Holliday, a Certified Shorthand |
| 6 | deposition taken on September 9, 2013; that I have made | 5 | Reporter, do hereby certify: |
| 7 | such corrections as appear noted on the Deposition | 6 | That prior to being examined, the witness in the |
| 8 | Errata Page, attached herein, as corrected, is true and | 7 | foregoing proceedings was by me duly sworn to testify to |
| 9 | correct. | 8 | the truth, the whole truth, and nothing but the truth; |
| 10 | | 9 | That said proceedings were taken before me at the |
| 11 | Dated this _____ day of _____ 2013, at | 10 | time and place therein set forth, and were taken down by |
| 12 | _____ , California. | 11 | me in shorthand and thereafter transcribed into |
| 13 | | 12 | typewriting under my direction and supervision; |
| 14 | | 13 | I further certify that I am neither counsel for, |
| 15 | | 14 | nor related to, any party to said proceedings, nor in |
| 16 | _____ | 15 | anywise interested in the outcome thereof. |
| 17 | Tom Cruise | 16 | In witness whereof, I have hereunto subscribed my |
| 18 | | 17 | name. |
| 19 | | 18 | |
| 20 | | 19 | Dated: September 19, 2013 |
| 21 | | 20 | |
| 22 | | 21 | _____ |
| 23 | | | Jean F. Holliday |
| 24 | | 22 | CSR No. 4535, RPR, CRR |
| 25 | | 23 | |
| | Page 242 | | Page 244 |

```
 1    DEPOSITION ERRATA SHEET
 2
 3    Page No._____ Line No. _____
      Change:_____
 4
      Reason for change: _____
 5
      Page No._____ Line No. _____
 6
      Change:_____
 7
      Reason for change: _____
 8
      Page No._____ Line No. _____
 9
      Change:_____
10
      Reason for change: _____
11
      Page No._____ Line No. _____
12
      Change:_____
13
      Reason for change: _____
14
      Page No._____ Line No. _____
15
      Change:_____
16
      Reason for change: _____
17
      Page No._____ Line No. _____
18
      Change:_____
19
      Reason for change: _____
20
      Page No._____ Line No. _____
21
      Change:_____
22
      Reason for change: _____
23
24
25    Tom Cruise          Dated
                                      Page 243
```

62 (Pages 242 to 244)

**U.S. LEGAL SUPPORT**
**(800) 993-4464**

EXHIBIT 26